## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---------------------------------------------------------------- :
ELIZABETH PICHLER, KATHLEEN : 
KELLY, RUSSELL CHRISTIAN, : 
DEBORAH BROWN, SETH NYE, : 
HOLLY MARTSEN, KEVIN QUINN, : 
JOSE L. SABASTRO, DEBORAH A. : 
SABASTRO, THOMAS RILEY, AMY : 
RILEY, RUSSELL DAUBERT and : 
CARRI DAUBERT, on behalf of :     **CIVIL ACTION NO. 04-CV-2841**
themselves and those similarly situated, : 
      : 
      **Plaintiffs,** : 
      : 
      **v.** : 
      : 
UNITE (UNION OF NEEDLETRADES, : 
INDUSTRIAL & TEXTILE : 
EMPLOYEES AFL-CIO), a New York : 
unincorporated association; BRUCE : 
RAYNOR, a New York resident; : 
INTERNATIONAL BROTHERHOOD : 
OF TEAMSTERS AFL-CIO; and : 
DOES 1-10, : 
      : 
      **Defendants.** : 
---------------------------------------------------------------- :


## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION OF DEFENDANTS UNITE AND
## BRUCE RAYNOR TO DISMISS THE AMENDED COMPLAINT

**KENNEDY, SCHWARTZ & CURE, P.C.**
**113 University Place - 7th Floor**
**New York, NY 10003**
**(212) 358-1500**

**WILLIG, WILLIAMS & DAVIDSON**
**1845 Walnut Street, 24th Floor**
**Philadelphia, PA 19103**
**(215) 656-3600**

**Attorneys for Defendants UNITE and**
     **Bruce Raynor**

**TABLE OF CONTENTS**

Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF THE ALLEGATIONS OF THE AMENDED COMPLAINT . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

POINT I

THE CONCLUSORY DPPA ALLEGATIONS SHOULD BE DISMISSED
BECAUSE CIVIL COMPLAINTS OF CRIMINAL CONDUCT MUST BE
STRICTLY CONSTRUED.  THE AMENDED COMPLAINT FAILS TO
IDENTIFY THE PERSONS OR MANNER IN WHICH THE DPPA WAS
VIOLATED AND FAILS TO ALLEGE THAT THE USE OF LICENSE PLATE
INFORMATION FOR UNION ORGANIZING PURPOSES IS NOT A
PERMITTED USE UNDER THE DPPA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A.    The DPPA Claim Rests Entirely on Conclusory "Information and Belief"
       Allegations That Do Not Meet the Requirements for a Civil Pleading of
       Criminal Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

B.    The Amended Complaint Does Not Allege That the Statutory DPPA Permitted
       Uses Are Inapplicable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

POINT II

THE DPPA CLAIM SHOULD BE DISMISSED BECAUSE IT
ENCROACHES ON THE PRIMARY JURISDICTION OF THE NATIONAL
LABOR RELATIONS BOARD TO REGULATE UNION ORGANIZING
ACTIVITY.  THE LEGISLATIVE HISTORY OF THE DPPA SHOWS IT
WAS NOT INTENDED TO PRECLUDE TRADITIONAL LABOR
ORGANIZING ACTIVITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

A.    The NLRB Has the Primary Jurisdiction to Regulate Labor Relations.  General
       Federal Statutes Must Be Interpreted to Avoid Interference with Recognized
       Lawful Labor Activity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

B.    The NLRB Has Long Recognized the Right of Unions to Use License Plate
       Information in Organizing Activities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

C.      It Is the Role of the NLRB to Balance Employee Privacy Interests and Union
        Organizational Needs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

D.      The Legislative History of the DPPA Demonstrates That it Was Not Intended
        to Interfere with Existing Labor Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

POINT III

        THE NORRIS LAGUARDIA ACT PROHIBITS THE REQUESTED
        INJUNCTIVE RELIEF IN THIS LABOR DISPUTE . . . . . . . . . . . . . . . . . . . . . . 20

POINT IV

        THE CONCLUSORY CLAIMS AGAINST RAYNOR SHOULD BE
        DISMISSED FOR FAILURE TO STATE A CAUSE OF ACTION . . . . . . . . . . . 23

IV.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## **TABLE OF AUTHORITIES**

### <u>Federal Cases</u>                                                <u>Page</u>

Assoc. of Civilian Technicians, Wichita Air Capitol Chapter v.
    Federal Labor Relations Authority, 360 F.3d 195 (D.C. Cir.  2004) . . . . . . . . . . . . . . . . . 19

Beverly Enterprises-Hawaii, Inc., 326 NLRB 335 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Briones v. Bon Secours Health Sys., 2003 WL 21467224 (3d Cir. June 5, 2003) . . . . . . . . . . 14

Central Hardware v. NLRB, 407 U.S. 539 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Chamber of  Commerce v. Reich, 74 F.3d 1322 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . 15

Cintas v. UNITE, 04-CV-99160 (S.D. Oh. Feb. 24, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Columbia River Packers Assoc., Inc. v. Hinton, 315 U.S. 143 (1942) . . . . . . . . . . . . . . . . . . . 22

Crawford Fitting Co. v. J.T. Gibbons, Inc.,
    482 U.S. 437 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Crowe Rope Industries, LLC, 1999 WL 33453677 (N.L.R.B. Div. of Judges July 26, 1999) . . 10

Flowers v. Continental Grain Co., Wayne Poultry Div., 775 F.2d 1051 (8th Cir. 1985) . . . . . . . 4

General Electric Co., 126 NLRB 123 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Golden Stevedoring Co., Inc., 335 NLRB 410 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Hausner Hard-Chrome of KY, Inc., 326 NLRB 426 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Hays v. Hoffman, 325 F.3d 982 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Hudgens v. NLRB, 424 U.S. 507 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17

Hutzler Brothers Co., 241 NLRB 914 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

International Broth. of Elec. Workers, Local 48, 332 NLRB No. 161 (2000) . . . . . . . . . . . . . . . 15

International Longshoremen's Assoc. v. Davis, 476 U.S. 380 (1986) . . . . . . . . . . . . . . . . . . . . . 11

Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Assoc.,
    457 U.S. 702 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Kerry Coal Co. v. United Mine Workers of America, 637 F.2d 957 (3d Cir. 1981) . . . . . . . . . 24
Lechmere, Inc. v. NLRB, 502 U.S. 527 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Livingston Shirt Corp., 107 NLRB 400 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Lukens Steel Co. v. United Steelworkers of America (AFL-CIO),
    989 F.2d 668 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Machinists Local 758, 267 NLRB 1147 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Mack v. South Bay Beer Distrib., 798 F.2d 1279 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . 8

McKelvey v. United States, 260 U.S. 353 (1922) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Meat Cutters Local 189 v Jewel Tea Co., 381 U.S. 676 (1965) . . . . . . . . . . . . . . . . . . . . . . . 12

Morse v. Lower Merion Sch. Dist., 132 F.3d 902 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . 5

NLRB v. Babcock & Wilcox Co., 351 U.S. 105 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

NLRB v. Baldwin Locomotive Works, 128 F.2d 39 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

NLRB v. Weingarten, Inc., 420 U.S. 251 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Pension Ben. Guar. Corp. v. White Consol. Industries, Inc.,
    998 F.2d 1192 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Phillips v. Bureau of Prisons, 591 F.2d 966 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Plant City Welding & Tank Co., 119 NLRB 131 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Ramsey v. United Mine Workers of America, 401 U.S. 302 (1971) . . . . . . . . . . . . . . . . . . . . . 24

Randell Warehouse of Arizona, Inc., 328 NLRB 1034 (1999) . . . . . . . . . . . . . . . . . . . . . . . . 18

Russell v. Choicepoint Services Inc., 302 F. Supp. 2d 654 (E.D. La. 2004) . . . . . . . . . . . . . . . 9

San Diego Bldg. Trades Council v. Garmon,
    359 U.S. 236 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Scheidler v. National Organization for Women, Inc.,
    537 U.S. 393 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters,
    436 U.S. 180 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Steelworkers (AFL-CIO) (Vulcan-Cincinnati, Inc.), 137 NLRB 95 (1962) . . . . . . . . . . . . . . . 16

Technology Service Solutions and International Brotherhood of Electrical Workers,

AFL-CIO, Local 111, 332 NLRB 1096 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United Mine Workers of America v. Pennington, 381 U.S. 657 (1965) . . . . . . . . . . . . . . . . . . 12

United States v. Adams, 174 F.3d 571 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Bailey, 277 F.2d 560 (7th Cir. 1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Boffa, 688 F.2d 919 (3d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Bornstein, 423 U.S. 303 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

United States v. Enmons, 410 U.S. 396 (1973 ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Local 560 of Int'l Bd. of Teamsters, 780 F.2d 267 (3d Cir. 1985) . . . . . . . . . 13

United States v. McArthur, 108 F.3d 1350 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Prentiss, 256 F.3d 971 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Vuitch, 402 U.S. 62 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United Steelworkers of America, (Oregon Steel Mills, Inc. D/b/a Cf & I Steel),
    2000 WL 33664321 (N.L.R.B. Div. of Judges Aug. 2, 2000) . . . . . . . . . . . . . . . . . . . . . . 16

Veliz v. Cintas, 03-CV-11380 (N.D. Ca. Mar. 20, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Villa Capri Manor, 268 NLRB 1163 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Wood v. National Basketball Assoc., 809 F. 2d 954 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . 12

Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639
    913 F.2d 948 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## Statutes

Drivers Privacy Protection Act, 18 U.S.C. §§ 2721- 2725 (1994) . . . . . . . . . . . . . . . . . . . . . . . 1

Drivers Privacy Protection Act, 18 U.S.C. §§ 2721(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Drivers Privacy Protection Act, 18 U.S.C. §§ 2721(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Drivers Privacy Protection Act, 18 U.S.C. §§ 2721(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Drivers Privacy Protection Act, 18 U.S.C. §§ 2721(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8

Drivers Privacy Protection Act, 18 U.S.C. §§ 2721(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Drivers Privacy Protection Act, 18 U.S.C. §§ 2725(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Federal Procurement Act, 40 U.S.C. §471 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

National Labor Relations Act, 29 U.S.C. §§ 141 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-19

The Norris LaGuardia Act, 29 U.S.C. § 104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

The Norris LaGuardia Act, 29 U.S.C. § 106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

The Norris LaGuardia Act, 29 U.S.C. § 113(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

<u>Legislative History</u>                                                                              <u>Page</u>

141 Cong. Rec. H416-05, 1995 WL 20358 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Senate Proceedings and Debates of the 103rd Congress,
     First Session Tuesday, November 16, 1993,
     139 Cong. Rec. S15745-01, S15761 to S15766, 1993 WL 470986 . . . . . . . . . . . . . . . . . 19

<u>Administrative Materials</u>

1998 NLRB GCM LEXIS 52, 23-24 (NLRB GCM , 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

# INTRODUCTION

This action grows out of the joint organizing efforts of two national unions, Defendants UNITE and the International Brotherhood of Teamsters, AFL-CIO ("Teamsters") (collectively "the Unions"), among employees of Cintas Corporation ("Cintas"). Union organizers from UNITE and the Teamsters allegedly approached Cintas employees at their homes to request their support for the Unions' organizational efforts at Cintas. The Amended Complaint alleges that this organizing activity violated the Drivers Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721. Union organizing activity is, however, heavily regulated by the National Labor Relations Board ("NLRB" or "Board") under the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 141 *et seq.*

The Amended Complaint must be dismissed because the legislative history of the DPPA demonstrates that it was not intended to upset long standing labor law doctrines authorizing the use of license plate information in aid of union organizing. The DPPA expressly permits private use of motor vehicle license plate information for many legitimate purposes including usages in connection with agency proceedings. As reflected in a published memorandum by the office of General Counsel of the NLRB, the Unions have filed a multitude of unfair labor practice charges in 18 NLRB regions against Cintas, engendering a nationally coordinated investigation by the NLRB. Applying the DPPA to thwart legitimate and traditional labor organizing would invade the primary jurisdiction of the NLRB to regulate labor union conduct.

In an echo of employer tactics a century ago, the Amended Complaint seeks injunctive relief to halt union organizational activity. The Norris LaGuardia Act, 29 U.S.C. § 101 *et seq.* deprives this court of jurisdiction to issue injunctive relief in a case involving or growing out of a labor dispute and compels the denial of this relief.

In addition, Plaintiffs have failed to properly plead a DPPA claim because they failed to allege the inapplicability of the permitted DPPA uses of license plate information in their Amended Complaint. This vaguely worded Amended Complaint on "information and belief" fails to meet the specificity required of a complaint alleging criminal conduct.

The Amended Complaint against the lone named individual defendant, Bruce Raynor ("Raynor"), the President of UNITE, must be dismissed for the above reasons, as well as because it does not allege his actual participation in any of the allegedly criminal activity.[1]

## SUMMARY OF THE ALLEGATIONS OF THE AMENDED COMPLAINT

Cintas is engaged in a labor dispute with UNITE and the Teamsters. Amended Complaint (herein "A. Com") at ¶¶ 20 and 25. Plaintiffs are employees of Cintas or a relative of someone so employed. *Id. At ¶ 23.* Defendant Unions allegedly violated the DPPA by using automotive license plate information to contact Plaintiffs at their homes as part of a union organizing campaign at Cintas. A. Com ¶¶ 25 and 46. The Amended Complaint specifically alleges that "As part of this so-called corporate campaign against Cintas, Defendants sought to enlist the support of Cintas' employees working at the Allentown, Pennsylvania facility [operated by Cintas]." A. Com ¶ 25 The Amended Complaint further alleges that UNITE and the Teamsters have "engaged in similar conduct towards other employees of Cintas . . . both in Pennsylvania and throughout the United States . . . for the purpose of contacting such persons as part of the corporate campaign against Cintas, by which Defendants sought to unionize Cintas' workforce."

---

[1]Defendants UNITE and Bruce Raynor join in the Motion to Dismiss filed this date by Defendant Teamsters, as well as the arguments advanced by the Teamsters in its Memorandum of Law filed in support of its Motion to Dismiss.

A. Com ¶ 46.  Defendant Raynor is alleged in a wholly conclusory manner to have "personally directed, authorized or otherwise supervised, the allegedly unlawful conduct."  A. Com ¶ 19.

The Amended Complaint alleges that the eight Cintas employee Plaintiffs ( Elizabeth Pichler, Kathleen Kelly, Deborah Brown, Seth Nye, Kevin Quinn, Jose L. Sabastro, Thomas Riley and Russell Daubert) and the five  relatives of Cintas employees (Russell Christian, Holly Martsen, Deborah A. Sabastro, Amy Riley and Carri Daubert) were each contacted at home in the winter of 2004 by alleged representatives of UNITE or the Teamsters.  In each case the alleged union representative "said he was with the union" A. Com ¶ 30 or, " said he was going from door to door to get support for the union" A. Com¶ 34 or "attempted to discuss the union" A. Com ¶¶ 28, 32, 36, 38 or " said he wanted to represent the Cintas workers" A. Com ¶ 34 or "called their personal residence" A. Com ¶ 42.  There is no allegation of any abusive or threatening conduct by any alleged union agents.

The Complaint alleges that "on information and belief" the Unions obtained Plaintiffs' home addresses illegally through  non-public motor vehicle records maintained by the Commonwealth of Pennsylvania because Plaintiffs have not voluntarily disclosed their personal information to Defendants, A. Com ¶ 43, and because only some of the Plaintiffs are listed in the telephone book. A. Com ¶¶ 28, 32, 36, 38, and 40.  In one case, during a home visit, the alleged union organizers allegedly asked by name for a non-Cintas employee who is a registered vehicle owner. A. Com ¶ 30.

**ARGUMENT**

**POINT I**

**THE CONCLUSORY DPPA ALLEGATIONS SHOULD BE DISMISSED BECAUSE CIVIL COMPLAINTS OF CRIMINAL CONDUCT MUST BE STRICTLY CONSTRUED. THE AMENDED COMPLAINT FAILS TO IDENTIFY THE PERSONS OR MANNER IN WHICH THE DPPA WAS VIOLATED AND FAILS TO ALLEGE THAT THE USE OF LICENSE PLATE INFORMATION FOR UNION ORGANIZING PURPOSES IS NOT A PERMITTED USE UNDER THE DPPA.**

**A.      The DPPA Claim Rests Entirely on Conclusory "Information and Belief" Allegations That Do Not Meet the Requirements for a Civil Pleading of Criminal Conduct.**

Plaintiffs base their entire DPPA claim on "information and belief" allegations that UNITE and Teamster organizers must have utilized non-public Department of Motor Vehicle ("DMV") information to contact them in their homes. The Amended Complaint does not allege who obtained such information, how it was obtained or any unlawful uses of the information. The Amended Complaint does not discuss or acknowledge the substantial number of statutory provisions in the DPPA that authorize use of DMV name and address information which are applicable to union organizing campaigns. A complaint alleging criminal conduct and seeking statutory penalties cannot rest solely on "information and belief" allegations concerning unspecified conduct by unnamed John Does when the conduct is equally capable of a lawful interpretation.

A complaint must set forth facts in support of its legal conclusions, especially one alleging criminal activity for which a civil penalty is being sought. <u>See</u> <u>Flowers v. Continental Grain Co., Wayne Poultry Div.</u>, 775 F.2d 1051, 1053-54 (8th Cir. 1985) ("Criminal statutes, even when incorporated by reference in a provision for civil recovery, are to be strictly construed and a

4

defendant faced with allegations of criminal conduct is entitled to clarity and specificity"). Complaints seeking a statutory penalty must be strictly construed not only to their literal terms but to the evident purpose of Congress in using those terms. Hays v. Hoffman, 325 F.3d 982, 992 (8th Cir. 2003) (In determining the number of false claims for which a statutory penalty should be assessed under 31 U.S.C. § 3729(a), the Supreme Court has cautioned that "we are actually construing the provisions of a criminal statute. Such provisions must be carefully restricted, not only to their literal terms but to the evident purpose of Congress in using those terms," citing United States v. Bornstein, 423 U.S. 303, 313, n. 8 (1976)).

Plaintiffs rest their entire DPPA claim on the supposition that licensed drivers who have not voluntarily given their names and addresses to union organizers and who do not have listed telephone numbers must have been located by union organizers through an unlawful use of DMV information. This Amended Complaint is entirely lacking in the kind of specificity that allegations of criminal conduct are required to meet. It is apparent that this Amended Complaint is nothing more than a fishing expedition in which Plaintiffs suspect the existence of, and hope to develop, a case of criminal misconduct through discovery. That they may not do. Defendants are entitled to facts supporting these legal conclusions. See Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997) ("[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss.")


**B.     The Amended Complaint Does Not Allege That the Statutory DPPA Permitted Uses Are Inapplicable**.

The Amended Complaint ignores the DPPA's statutorily permitted uses that exempt legitimate union organizing from the DPPA's prohibitions. The DPPA generally prohibits any

state DMV, or officer, employee, or contractor thereof, from "knowingly disclos[ing] or otherwise mak[ing] available to any person or entity: (1) personal information . . . about any individual obtained by the department in connection with a motor vehicle record." 18 U.S.C. § 2721(a)(1). But the DPPA's prohibition of nonconsensual disclosures is expressly subject to a number of statutory permitted uses. For example, disclosure is permitted for use "by any government agency" or by "any private person or entity acting on behalf of a Federal, State or local agency in carrying out its functions." 18 U.S.C. § 2721(b)(1).

Section 2721(b)(4) makes it statutorily permissible to obtain, disclose and use personal information from motor vehicle records:

> in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court.

(Emphasis added.)

The DPPA also regulates the resale and redisclosure of drivers' personal information by private persons who have obtained that information from a state DMV. See 18 U.S.C. § 2721(c). In general, the DPPA allows private persons who have obtained drivers' personal information for one of the aforementioned permissible purposes to further disclose that information for any one of those purposes.

It is important to note that the relevant statutory permitted uses are specifically included in the text of the statute that defines the elements of the offense: DPPA § 2721(a)(2) states that a state DMV cannot disclose "highly restricted personal information, as defined in 18 U.S.C.

§ 2725(4), about any individual obtained by the department in connection with a motor vehicle record, without the express consent of the person to whom such information applies, <u>except uses permitted in subsections (b)(1), (b)(4), (b)(6), and (b)(9) . . . .</u>" (Emphasis added.)

In <u>United States v. Vuitch</u>, 402 U.S. 62 (1971) the Supreme Court held that "[i]t is a general guide to the interpretation of criminal statutes that when an exception is incorporated in the enacting clause of a statute, the burden is on the prosecution to plead and prove that the defendant is not within the exception." *Id.* at 70. These exceptions are a central part of the statutory scheme. In <u>United States v. Adams</u>, 174 F.3d 571, 578 (5th Cir. 1999), the Court held that where a regulation indicates by its own language that its prohibition does not extend to the two circumstances set forth in the exceptions, the onus is on the Government to prove that neither circumstance existed in the present case. Similarly, in <u>United States v. Prentiss</u>, 256 F.3d 971, 979 (10th Cir. 2001), the Court observed that some "exceptions" are so closely intertwined with the definition of the offense that the government must allege them in the indictment[2].

---

[2]  <u>McKelvey v. United States</u>, 260 U.S. 353, 357 (1922) is typically cited for the proposition that: "[A]n indictment ... founded on a general provision defining the elements of an offense, or of a right conferred, need not negative ... an exception made by a proviso or other distinct clause, whether in the same section or elsewhere, and that it is incumbent on one who relies on such an exception to set it up and establish it." As <u>United States v. Prentiss</u>, 256 F.3d 971, 979 (10th Cir. 2001) pointed out, however: "McKelvey's general provision/proviso dichotomy is only one interpretative aid among several that should be applied in parsing statutes that define offenses." <u>United States v. McArthur</u>, 108 F.3d 1350, 1359 (11th Cir. 1997) (characterizing <u>McKelvey</u> and another rule of construction as "merely interpretive aids" to be considered along with "other indications of legislative will evident in the statute"); <u>United States v. Bailey</u>, 277 F.2d 560, 562-64 (7th Cir. 1960) (stating that the purpose of the statute must be considered in determining whether the government is required to allege that the defendant's conduct does not fall within an exception). The critical pleading question then is whether the DPPA statutory exemptions are so closely intertwined with the definition of the offense that an indictment ignoring them must fail. Since Congress plainly incorporated the § 2721(b)(4) "legal proceedings permitted use" in the text of the clause defining the elements of the offense, a civil complaint or an indictment alleging a DPPA violation that does not allege the permitted uses to

Any large union organizing drive is replete with court and agency proceedings. The Cintas organizing campaign is no exception. This Court can take judicial notice of the public records showing that the UNITE/Teamsters organizing campaign has resulted in the filing of over 100 allegations of unfair labor practices against Cintas with the NLRB in many different Regional offices around the United States[3]. Courts have defined a public record, for purposes of what properly may be considered on a motion to dismiss, to include letter decisions of government agencies, see Phillips v. Bureau of Prisons, 591 F.2d 966, 968 (D.C. Cir. 1979), and published reports of administrative bodies, see Mack v. South Bay Beer Distrib. Inc., 798 F.2d 1279, 1282 (9th Cir. 1986). See also Pension Ben. Guar. Corp. v. White Consol. Industries, Inc., 998 F.2d 1192, 1197 (3d Cir. 1993).

---

be inapplicable is defective and must be dismissed.

[3] The National Labor Relations Board has posted on its web site at http://www.nlrb.gov/nlrb/shared_files/ommemo/ommemo/om04-73.pdf a General Counsel memorandum which discusses the high number of pending agency proceedings involving Cintas and the Defendant Unions:

> A.  VI.  Cintas Corporation Section 8(a)(1) and (3) charges have recently been filed by the Union of Needletrades, Industrial and Textile Employees, AFL-CIO, CLC (UNITE!), in Regions 1, 4, 5, 6, 7, 9, 11, 12, 13, 16, 20, 21, 22, 25, 28, 29, 32 and 34 against Cintas Corporation (Cintas), an employer engaged in the laundry business and the supply of uniforms and other textiles. The charges arise out of an ongoing organizing campaign by UNITE among the employees of Cintas. Some of the charges that were filed allege that Cintas engaged in surveillance of hand billing activities, discouraged or prohibited employees from reading or receiving handbills and prohibited or interfered with hand billing by representatives of UNITE. Other charges allege that Cintas engaged in unlawful interrogations and other Section 8(a)(1) threats, and that it has disciplined or discharged named employees because of their activities on behalf of UNITE in violation of Section 8(a)(3). Region 4, Philadelphia will be the lead Region coordinating the handling of these charges.

In addition, many Cintas employees have filed a class action lawsuit against Cintas alleging violations of the applicable minimum wage statutes.  See Veliz v. Cintas, 03-CV-11380 (N.D. Ca. Mar. 20, 2003).  Cintas, in turn, has filed a suit seeking millions of dollars in damages against UNITE for allegedly misappropriating and misusing confidential commercial trade secrets of Cintas.  See Cintas v. UNITE, 04-CV-00160 (S.D. Oh. Feb. 24, 2004).  For present purposes, the issue is not whether the Unions or Cintas will be the prevailing party in this welter of proceedings but whether this Amended Complaint  – which is silent as to the existence of these many court and agency proceedings and does not even try to allege that the union organizers were not acting in connection with these or other court or agency proceedings between Cintas and the Defendant unions – meets the exacting standards of pleading a criminal violation for which a penalty is sought.  Russell v. Choicepoint Services, Inc., 302 F. Supp. 2d 654 (E.D. La. 2004), dismissed a claimed violation of the DPPA because the statute permits entities to obtain drivers' personal information from departments of motor vehicles unless an impermissible use is established.  Since the alleged conduct, *i.e.*, union organizers visiting employees in their homes to solicit their assistance and support for the union, is plainly lawful to the extent it occurred in connection with any of the permitted uses, Plaintiffs have failed to meet their burden of pleading violations of this criminal statute with clarity and specificity.

## POINT II

**THE DPPA CLAIM SHOULD BE DISMISSED BECAUSE IT ENCROACHES ON THE PRIMARY JURISDICTION OF THE NATIONAL LABOR RELATIONS BOARD TO REGULATE UNION ORGANIZING ACTIVITY. THE LEGISLATIVE HISTORY OF THE DPPA SHOWS IT WAS NOT INTENDED TO PRECLUDE TRADITIONAL LABOR ORGANIZING ACTIVITY.**

Union organizing requires outreach to employees away from their place of business to be successful. Employer weapons to discourage unionization such as a "captive audience" meeting are not available to unions. The "home visit" to employee residences is a time honored union tool in organizing drives[4]. As we discuss below, union use of license plate information for organizing purposes is well regulated by the NLRB. The DPPA, a general statute that does not and was not intended by Congress to apply to traditional union organizing, should not be construed in a manner that would upset the delicate balance between the employer's private

---

[4] Plant City Welding & Tank Co., 119 NLRB 131, 133-34 (1957), rev'd on other grounds, 133 NLRB 1092 (1961), addressed the "technique of visiting and interviewing employees at their homes" and held home visits lawful because:

> there is a substantial difference between the employment of the technique of individual interviews by employers on the one hand and by unions on the other. Unlike employers, unions often do not have the opportunity to address employees in assembled or informal groups, and never have the position of control over tenure of employment and working conditions which imparts the coercive effect to systematic individual interviews conducted by employers. (Emphasis added.)

Similarly, in Crowe\ Rope Industries, 1999 WL 33453677 (N.L.R.B. Div. of Judges Jul. 26, 1999), an Administrative Law Judge commented that "[i]n early January 1997, the Union began what it called a 'blitz,' which consisted of intense efforts to obtain signed authorization cards, the use of home visits and leafleting at the involved plants." (Emphasis added). See also Hausner Hard-Chrome of KY, Inc., 326 NLRB 426, 432 (1998) (home visits were made to employees to solicit their support for the Union.) Finally, in Beverly Enterprises-Hawaii, Inc., 326 NLRB 335, 345 (1998), the Board found "fully adequate" a union's traditional means of organization, such as solicitation of workers while entering and leaving the employer's premises, home visits, and union meetings. Id. Citing Livingston Shirt Corp., 107 NLRB 400, 406 (1953).

property-based right to bar union organizers from its property and the need of unions for access to the work force. It is the primary jurisdiction of the NLRB to balance these interests of employer private property rights, union organizational needs and the right of employees to be free from coercion.

**A. The NLRB Has the Primary Jurisdiction to Regulate Labor Relations. General Federal Statutes Must Be Interpreted to Avoid Interference with Recognized Lawful Labor Activity.**

Congress enacted the NLRA with the intent of creating an administrative agency, the NLRB, with exclusive jurisdiction over labor disputes. The Supreme Court has repeatedly held that the NLRA preempts state and federal court jurisdiction over labor disputes, because Congress' intent in enacting the NLRA was to create an expert, centralized administrative agency to administer the Act. See *e.g.*, Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters, 436 U.S. 180 (1978). The Supreme Court has stated:

> [g]iven our longstanding interpretation of congressional intent regarding NLRA preemption under Garmon, … [b]ased on its constitutional power to regulate interstate commerce, Congress has created by statute a uniform body of laws governing labor relations and has vested in the National Labor Relations Board the exclusive jurisdiction over administration of those laws. And, although the exclusive nature of this jurisdiction was not explicitly noted by Congress, this Court has held that such exclusivity was intended by Congress.

International Longshoremen's Assoc. v. Davis, 476 U.S. 380, 393 (1986). The Supreme Court has ruled that when an activity is arguably subject to §§ 7 or 8 of the NLRA, the States as well as the federal courts must defer to the exclusive competence of the NLRB. See San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 245 (1959).

Labor preemption is not limited to state laws. The doctrine of primary jurisdiction requires that federal courts work out the boundaries of statutes that intrude, intentionally or not,

into areas of labor relations. Courts have held that due to the remedial nature of the NLRA and the primacy of the NLRB in resolving unfair labor practice disputes, general federal statutes do not apply to the activities by workers, unions, and employers that are regulated by the NLRA.

The two most common regimes of federal legislation that arguably overlap and conflict with labor legislation is antitrust legislation, such as the Sherman Act, and the Bankruptcy Code. The Supreme Court has recognized a broad non-statutory labor exemption from the antitrust laws in many cases, including United Mine Workers of America v. Pennington, 381 U.S. 657 (1965), and Meat Cutters Local 189 v. Jewel Tea Co., 381 U.S. 676 (1965). While unions can be subject to antitrust regulation when they combine with non-labor entities for purposes independent of "labor union interests", they are exempt when they are acting solely in their own interests. In Wood v. National Basketball Assoc, 809 F.2d 954 (2d Cir. 1987), the Second Circuit rejected an antitrust based challenge to the NBA collective bargaining agreement with its players' union not on the basis of the labor exemptions to the antitrust laws but because the plaintiff's claims amounted to "a wholesale subversion" of the national labor policy which "must be rejected out of hand." *Id.* at 959.

In the area of bankruptcy, the Third Circuit has held that the NLRA gives the Board exclusive jurisdiction over unfair labor practices by employers in bankruptcy and that "[t]he jurisdiction of a United States District Court in bankruptcy does not embrace the power to treat with a debtor's unfair labor practices which affect commerce" and "explicitly removes the possibility of any restraint under the Board's power. . . ." NLRB v. Baldwin Locomotive Works, 128 F.2d 39, 44 (3d Cir. 1942).

The Third Circuit has also held that violations of Section 7 of the NLRA could not be a predicate act for a RICO claim. United States v. Local 560, Teamsters, 780 F.2d 267, 282, n. 16 (3d Cir. 1985). In United States v. Boffa, 688 F.2d 919 (3d Cir. 1982), the Third Circuit considered whether the doctrine of primary jurisdiction operates to "displace" a federal criminal statute that independently prohibits conduct that is also arguably prohibited by the NLRA. Boffa held that Congress did not intend for a scheme to defraud employees of their § 7 rights under the NLRA to fall within the ambit of the mail fraud statute. Id. at 929. The Boffa Court stated: "We believe that Congress did not envision that the mail fraud statute would serve as an exception to its policy of insuring a uniform interpretation of the NLRA by an administrative agency with special expertise in the labor area." Id. at 930. Boffa rejected the argument that a violation of union rights under § 7 of the NLRA may be characterized as a RICO predicate act because of the "remedial nature of the [NLRA] and the primacy of the National Labor Relations Board in resolving unfair labor practice disputes." Id. at 927.

The D.C. Circuit opinion in Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union, 639, 913 F.2d 948, 955-56, (D.C. Cir. 1990), thoroughly analyzed the need to avoid a statutory construction of federal laws in a manner that interferes with federal labor policy in the absence of compelling evidence that Congress intended such a construction:

> If appellant is correct that by conducting the strike and organizational effort the Union participated in the conduct of the affairs of Yellow Bus, ... then, provided the requisite pattern of racketeering activity could be shown, RICO might apply in the context of innumerable labor-management clashes. Judge Edwards noted in his concurrence to the panel's opinion, 'This result seems strangely at odds with certain fundamental precepts of labor law and collective bargaining' ... We agree. Federal labor law has been crafted to strike a delicate balance between labor and management interests. The Supreme Court has stated, for instance, 'Accommodation between employees' § 7 rights and employers' property rights ... 'must be obtained with as little destruction of one as is consistent with the maintenance of the other.'' Hudgens v. NLRB, 424 U.S. 507, 521, 96 S.Ct. 1029, 1037,

47 L.Ed.2d 196 (1976) (quoting <u>NLRB v. Babcock & Wilcox Co.</u>, 351 U.S. 105, 112, 76 S.Ct. 679, 684, 100 L.Ed. 975 (1956)).  <u>By giving management a potentially powerful weapon to wield against striking workers, the result the bus line urges would reset the labor-management balance.  Congress is certainly free to lay an extensive RICO blanket over entire areas of federal regulation, making attorneys fees and treble damages available in areas such as federal labor law. However, we are confident that if Congress had intended to so dramatically alter our legal terrain, it would have done so clearly and unequivocally.</u>

(Emphasis added)

Even absent specific statutory exemption language, certain activities arguably covered by §§ 7 and 8 of the NLRA are exempt from conflicting federal laws where those laws curtail rights granted by the NLRA.  In <u>Briones v. Bon Secours Health Sys.</u>, 2003 WL21467224 (3d Cir. June 5, 2003), a panel of the Third Circuit held "[i]f the [NLRB] decides, subject to appropriate federal judicial review, that conduct is protected by § 7, or prohibited by § 8, then the matter is at an end,  and the States are ousted of all jurisdiction.  <u>Such a decision has the same effect upon the jurisdiction of a federal court</u>."  (Emphasis added).

Other cases similarly acknowledge the need to interpret federal statutes in a manner that does not limit classic union activities.  <u>United States v. Enmons</u>, 410 U.S. 396, 410 (1973), interpreted the Hobbs Act to not cover "the use of violence to achieve legitimate union objectives such as higher wages . . ." in order to prevent the Hobbs Act from interfering with federal labor policy:

> Construed in this fashion, the Hobbs Act has properly been held to reach instances where union officials threatened force or violence against an employer in order to obtain personal payoffs, and where unions used the proscribed means to exact 'wage' payments from employers in return for 'imposed, unwanted, superfluous and fictitious services' of workers. For in those situations, the employer's property has been misappropriated.  <u>But the literal language of the statute will not bear the Government's semantic argument that the Hobbs Act reaches the use of violence to achieve legitimate union objectives, such as higher wages in return for genuine services which the employer seeks</u>.

(Emphasis added.)

14

Chamber of Commerce v. Reich, 74 F.3d 1322 (DC Cir. 1996), interpreted the Federal

Procurement Act, 40 U.S.C. § 471, to deny Presidential power to debar from federal contracts

employers who hire strikebreakers, since such a bar would damage recognized employer rights

under the NLRA. The Chamber of Commerce court reasoned that a cardinal rule of statutory

construction disfavors repeals of long recognized rights by implication in general statutes and

that "[w]here there is no clear intention otherwise, a specific statute will not be controlled or

nullified by a general one....", citing Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437,

445 (1987). In International Broth. of Elec. Workers, Local 48, 332 NLRB No. 161 (2000) the

Board described the Chamber of Commerce opinion as holding that the executive order was

unlawful because it was inconsistent with the established NLRA principle that an employer may

lawfully hire permanent replacements for economic strikers, and was based on a statute that did

not directly address that issue (or, indeed, labor relations generally). Since the DPPA does not

and was not intended to address labor relations, the established union rights under the NLRA

similarly limit the application of the DPPA to traditional union organizing activities.

**B.** **The NLRB Has Long Recognized the Right of Unions to Use License Plate Information in Organizing Activities**.

The NLRB has carefully regulated when unions can and cannot copy down car license

plates as an employee identification tool. For example, in Golden Stevedoring Co., Inc., 335

NLRB 410, 413 (2001), the company alleged that a union agent was observed in an adjacent

parking lot taking down the license tag numbers of employees. The Board held that the agent

was investigating reports that nonstriking employees were using the main gate, rather than the

gate designated for them. In doing so, he was seeking to gather information relevant to whether

the Union's picketing could be lawfully extended to the main gate: "[The] investigation, clearly

undertaken in his capacity as an agent of the employees' bargaining representative, was protected activity." Other cases find the gathering of license plate numbers coercive surveillance[5]. In either direction, this is an area heavily regulated by the Board.

The NLRB has stated that the recording of license plate numbers is a "usual channel that non-employee union organizers have attempted to use to communicate with employees about the advantages of organization." Technology Service Solutions and International Brotherhood of Electrical Workers, AFL-CIO, Local 111, 2000 WL 1663428 *12 (N.L.R.B. Div. of Judges Oct. 31, 2000). In Hutzler Brothers Company, 241 NLRB 914, 918 (1979), enf't. denied on other grounds, 630 F.2d 1012 (4th Cir., 1980), an Administrative Law Judge concluded that the union did not need a special channel for communication with workers since it had the ability to obtain the name and address of registered employee automobile owners upon request to the DMV and therefore concluded that:

> the names and addresses of employees procurable from such license plate numbers would afford the Union a reasonable alternative channel of communication with slightly in excess of 50 percent of Respondent's employees either by mail, home visits, or telephone solicitation (the telephone numbers could readily be obtained once the Union had names and addresses).

---

[5] See e.g., Steelworkers (AFL-CIO) (Vulcan-Cincinnati, Inc.), 137 NLRB 95 (1962). In addition, recording license plate numbers of nonstrikers is a form of coercion recognized by the Board as a violation of the Act. Machinists Local 758, 267 NLRB 1147, 1162 (1983); General Electric Co., 126 NLRB 123 (1960). But the act of recording license plate numbers for identification takes on its coercive character from the context in which it takes place. In Steelworkers, (Oregon Steel Mills, Inc. d/b/a CF & I Steel), 2000 WL33664321 (N.L.R.B. Div. of Judges Aug. 2, 2000), an Administrative Law Judge held that recording of license plate numbers by pickets constitutes picket line misconduct that coerces employees in the context of threats and other misconduct. Similarly, in Villa Capri Manor, 268 NLRB 1163, 1163 (1984), the Board said that in certain circumstances also including the presence of other unfair labor practices, the recording of license plate numbers of vehicles could "when considered in their totality, . . . create a general atmosphere of fear and coercion rendering a free choice in the election impossible."

In a 1998 NLRB General Counsel Advice Memorandum the General Counsel listed recording of license plates as one of the methods that must be proven futile before a union can request an employee list from an employer, stating "we conclude that the Union has not demonstrated that license plate observations and handbilling would not be successful methods of communicating with (or among) employees in the future." 1998 NLRB GCM LEXIS 52, 23-24 (NLRB GCM, 1998). The Memorandum was written one year after the enactment of the DPPA. The NLRB plainly considers license plate based data gathering acceptable conduct under § 7 of the NLRA.

**C.    It Is the Role of the NLRB to Balance Employee Privacy Interests and Union Organizational Needs.**

In  Hudgens v. NLRB, 424 U.S. 507, 521-23 (1976), the Court held that the task of the NLRB, subject to review by the courts, is to resolve conflicts between § 7 rights and private property rights, "and to seek a proper accommodation between the two."  What is "a proper accommodation" in any situation may largely depend upon the content and the context of the § 7 rights being asserted.  In Central Hardware v. NLRB, 407 U.S. 539, 543 (1972), and earlier in the case of NLRB v. Babcock & Wilcox Co., 351 U.S. 105 (1956), the Court considered the nature of the Board's task in this area under the Act.  Accommodation between employees' § 7 rights and employers' property rights, the Court said in Babcock & Wilcox, "must be obtained with as little destruction of one as is consistent with the maintenance of the other."  Id. at 112.  The locus of that accommodation, however, may fall at differing points along the spectrum depending on the nature and strength of the respective § 7 rights and private property rights asserted in any given context.  In each  situation, the primary responsibility for making this accommodation must rest with the Board in the first instance.  "The responsibility to adapt the Act to changing patterns

of industrial life is entrusted to the Board." NLRB v. Weingarten, Inc., 420 U.S. 251, 266 (1975).[6]

The Board must also be the primary agency entrusted with an accommodation of an employee's privacy interests and the national interest in protecting the rights of labor unions to utilize reasonable methods for locating and contacting employees in union organizational campaigns. In their Amended Complaint, Plaintiffs do not assert any threatening or abusive conduct by the alleged union representatives. Such conduct would be an unfair labor practice in any event. The only activity alleged is a simple request to discuss the union. It would stand decades of federal labor policy on its head to conclude that this alleged conduct – the precise activity which federal law expects and encourages unions to undertake – is somehow unlawful.

### D.    The Legislative History of the DPPA Demonstrates That it Was Not Intended to Interfere with Existing Labor Activity

The legislative history of the DPPA, while sparse, makes clear that the intent of Congress was to preclude stalker type conduct and invasive commercial activity. See e.g., 141 Cong. Rec. H416-05, 1995 WL 20538 ("Congress heard the concerns of women who were being stalked because of easy access to motor vehicle records that reveal the addresses of threatened women. ... It was needed because all the States were not adequately addressing this serious threat to women.") The principal Senate sponsor of the DPPA, Senator Barbara Boxer, described the

---

[6]In Lechmere, Inc. v. NLRB, 502 U.S. 527, 530 (1992), the Supreme Court did not register any disapproval of the Union's use of license plate numbers to obtain name and address information then used for mailings and telephone calls and home visits in the Union's organizing drive; see also Randell Warehouse of Arizona, Inc., 328 NLRB 1034, 1036 n. 7 (1999), review granted and remanded for other reasons, 252 F.3d 445 (D.C. Cir. 2001) (NLRB notes that Supreme Court "implicitly approved" of union organizing practice of communicating with employees at their home after obtaining addresses from state department of motor vehicles).

conduct she sought to prohibit by this Act in the Congressional Record.  Senate Proceedings and

Debates of the 103rd Congress, First Session Tuesday, November 16, 1993, 139

Cong. Rec. S15745-01, 15761 to 15766, 1993 WL 470986.  Her concerns were primarily stalkers

preying on women:

> Mr. President, today I join the Senator from Virginia and 26 other cosponsors, to offer an amendment to protect the privacy of all Americans.  In California, actress Rebecca Schaeffer was brutally murdered in the doorway of her Los Angeles apartment by a man who had obtained her home address from my State's DMV.  In Iowa, a gang of teenagers copied down the license plate numbers of expensive cars, obtained the home addresses of the owners from the Department of Transportation, and then robbed them at night.  In Tempe, AZ, a woman was murdered by a man who had obtained her home address from that State's DMV.  And, in California, a 31-year-old man copied down the license plate numbers of five women in their early twenties, obtained their home address from the DMV and then sent them threatening letters at home.  I want to briefly read from two of those letters.  'I'm lonely and so I thought of you.  I'll give you one week to respond or I will come looking for you.'  Another one read: 'I looked for you though all I knew about you was your license plate.  Now I know more and yet nothing.  I know you're a Libra, but I don't know what it's like to smell your hair while I'm kissing your neck and holding you in my arms.'  When they apprehended him, they found in his possession a book entitled <u>You Can Find Anyone</u> which spelled out how to do just that using someone's license plate.

<u>See</u> <u>also</u> 139 Cong. Rec. S15745-01, S15766 (Nov. 16, 1993) (comments of Senator Harkin);

139 Cong. Rec. S15745-01, S15765 (Nov. 16, 1993) (statement of Senator Boxer); 139 Cong.

Rec. S15745-01, S15765 (Nov. 16, 1993) (statement of Senator Robb); 139 Cong. Rec. S15745-

01, S15765 (statement of Senator Biden).  There is nothing in the legislative history of the DPPA

that suggests Congress considered the impact of applying this statute to traditional union

organizing activities.  This Court should defer to the primary jurisdiction of the NLRB in

determining when unions can and cannot utilize license plate based information gathering as an

organizational tool.

In <u>Assoc. of Civilian Technicians, Wichita Air Capitol Chapter v. Federal Labor Relations</u>

<u>Authority</u>, 360 F.3d 195 (D.C. Cir. 2004), an employer argued that a statute criminalized

collective bargaining over the terms of military service on behalf of members of the National

Guard who are serving on full-time National Guard duty.  The Court denied this literal reading of

the statute in question because it would not presume Congress intended to criminalize labor

relations without "clear and definite" Congressional guidance:

> The union's temporal reading of section 976 also finds support in the well-established principle that 'penal statutes are to be construed strictly.'  When choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.  Although this is not a criminal case, the Supreme Court has made clear that '[t]here cannot be one construction for the [regulatory agency] and another for the Department of Justice.  If we should give [the statute] the broad construction urged by the [agency], the same construction would likewise apply in criminal cases.'  So too here.  Absent 'clear and definite' guidance from Congress, we will not choose the Authority's 'harsher alternative,' which would criminalize negotiations on behalf of technicians concerning work assigned to them in their civilian capacity.

332 F.3d at 1284-86. (Citations omitted.) (Emphasis added).  See also Scheidler v. National

Organization for Women, Inc., 537 U.S. 393 (2003) (When there are two rational readings of a

criminal statute, one harsher than the other, courts are to choose the harsher only when Congress

has spoken in clear and definite language).  It is both rational and appropriate to construe the

DPPA as inapplicable to the labor activities described in the Amended Complaint.  The

Amended Complaint should be dismissed because to apply this statute to the Unions' alleged

conduct would encroach on the primary jurisdiction of the NLRB in the absence of any

suggestion that Congress so intended.

## POINT III

### THE NORRIS LAGUARDIA ACT PROHIBITS THE
### REQUESTED INJUNCTIVE RELIEF IN THIS LABOR DISPUTE

The Amended Complaint expressly recognizes that the alleged union conduct is occurring

in the midst of a labor dispute between the two Unions and Cintas and seeks an injunction to halt

this form of traditional union organizing activity.  The Norris LaGuardia Act, 29 U.S.C. § 104

("Norris LaGuardia")  deprives this Court of authority to grant an injunction which would

prohibit any person from giving publicity to the facts involved in a labor dispute by any method

not involving fraud or violence:

> no court of the United States shall have jurisdiction to issue any restraining order or
> temporary or permanent injunction in any case involving or growing out of any labor
> dispute to prohibit any person or persons participating or interested in such dispute (as
> these terms are herein defined) from doing, whether singly or in concert, any of the
> following acts:
>
> (d) By all lawful means aiding any person participating or interested in any labor
> dispute who is being proceeded against in, or is prosecuting, any action or suit in any
> court of the United States or of any State;
> (e) Giving publicity to the existence of, or the facts involved in, any labor dispute,
> whether by advertising, speaking, patrolling, or by any other method not involving
> fraud or violence;
>
>> (i) Advising, urging, or otherwise causing or inducing without fraud or
>> violence the acts heretofore specified . . .

The Amended Complaint pleads the existence of a labor dispute between Cintas and the

Defendant Unions and requests that the Defendant Unions be enjoined from engaging in

traditional union organizational activity.  Norris LaGuardia defines a "labor dispute" as

including: " any controversy concerning terms or conditions of employment, or concerning the

association or representation of persons negotiating, fixing, maintaining, changing, or seeking to

arrange terms or conditions of employment, regardless of whether or not the disputants stand in

the proximate relation of employer and employee." 29 U.S.C. § 113(c). The Supreme Court has stated that a case involves a labor dispute if "the employer-employee relationship [is] the matrix of the controversy." Columbia River Packers Assoc, Inc. v. Hinton, 315 U.S. 143, 147, (1942). The Third Circuit has recognized that this interpretation of the term "labor dispute" furthers the "intentionally broad" scope of Norris LaGuardia. Lukens Steel Co. v. United Steelworkers of America (AFL-CIO) 989 F.2d 668, 676-77 (3d Cir. 1993). Since this Amended Complaint alleges that the employer/employee relationship between the employee Plaintiffs and Cintas is the reason for the alleged home visits by the Defendant Unions, it is a labor dispute concerning the representation of persons and terms and conditions of employment.

In Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Assoc., 457 U.S. 702, 707 (1982) the Court held that Congress adopted § 104's broad prohibition to remedy the growing tendency of federal courts to enjoin labor activity in a labor dispute and commented that the anti-injunction provisions of Norris LaGuardia have consistently been given a broad interpretation, excepting only limited situations where necessary to accommodate specific federal legislation or paramount congressional policy. There is no specific federal labor legislation or paramount Congressional policy concerning union use of license plate information for organizational activity. Norris LaGuardia plainly precludes the injunctive relief requested in the Amended Complaint.

# POINT IV

## THE CONCLUSORY CLAIMS AGAINST RAYNOR MUST BE DISMISSED FOR FAILURE TO STATE A CAUSE OF ACTION.

In addition to the claims against UNITE and the Teamsters, the Amended Complaint names Bruce Raynor, the President of UNITE, as a Defendant.  The Amended Complaint mentions Raynor only at paragraph 19 in which Raynor is said  "on information and belief" to have "caused UNITE and others (including those whose identities are not presently known and are sued herein as Doe defendants) to engage in, as well as personally directed, authorized or otherwise supervised, the unlawful conduct alleged herein."

The Amended Complaint is utterly without even a single detail or amplification as to Raynor's role in the conduct allegedly unlawful under the DPPA.  For the reasons specified in Point I above, the DPPA claim against Raynor should be dismissed for failure to plead the alleged criminal conduct with adequate specificity.  For the reasons given in Point II above, the DPPA claim against Raynor should also be dismissed because it is preempted by the NLRA.

Finally, the Amended Complaint against Raynor fails to satisfy the requirements of Norris LaGuardia, 29 U.S.C. § 106 that

> no officer . . . of any association or organization, . . . participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.

This Amended Complaint does not allege that Defendant Raynor actually participated in, authorized or ratified the allegedly illegal or tortious acts.  Since the legal standard requires "clear proof" of such actual conduct by union officers, a complaint must specifically allege facts from which such actual participation, authorization or ratification can be clearly inferred.  The

Amended Complaint does not meet this exacting standard and should therefore be dismissed against Defendant Raynor for that reason as well.  See Ramsey v. United Mine Workers of America, 401 U.S. 302, 310 (1971) (Norris LaGuardia, § 6 requires that when illegal acts of any individual are charged against one of the major antagonists in a labor dispute--whether employer or union--the evidence must clearly prove that the individual's acts were authorized or ratified); Kerry Coal Co. v. United Mine Workers of America, 637 F.2d 957, 964 (3d Cir., 1981) (In pursuing a state law claim against members of a labor organization, the "clear proof" standard of proof of § 6 of Norris LaGuardia applies).

## CONCLUSION

For all of the foregoing reasons, the Amended Complaint should be dismissed in its entirety against UNITE and Bruce Raynor.

Respectfully submitted,
KENNEDY, SCHWARTZ & CURE, P.C.

_____
Thomas M. Kennedy, Esquire
Susan M. Jennik, Esquire
Kennedy, Schwartz and Cure, P.C.
113 University Place, 7th Floor
New York, NY 10003
(212) 358-1500
(admission pro hac vice pending)

WILLIG, WILLIAMS & DAVIDSON

_____
Laurence M. Goodman, Esquire
Mark Featherman, Esquire
1845 Walnut Street, 24thFloor
Philadelphia, PA 19103
(215) 656-3600

Attorneys for Defendants UNITE and
Bruce Raynor

Date:     September 1, 2004