IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ELIZABETH PICHLER, et al.        :        CIVIL ACTION
                                 :
            v.                   :
                                 :
UNITE (UNION OF NEEDLETRADES,    :
INDUSTRIAL & TEXTILE EMPLOYEES   :
AFL-CIO), et al.                 :        NO. 04-2841

MEMORANDUM

Dalzell, J.                                    August 30, 2006

        In 2003 and 2004, two labor unions obtained many
license plate numbers from cars in the parking lots of a firm
whose employees they were attempting to organize.  The unions
used those license plate numbers to get employees' names and
addresses.  Claiming that the unions' actions violated the
Driver's Privacy Protection Act of 1994 ("DPPA" or the "Act"),[1]
the named plaintiffs brought this class action.  Before us now
are the parties' cross-motions for summary judgment[2] and their

_____

[1] 18 U.S.C. §§ 2721-2725 (2006).

[2] Summary judgment is appropriate if there is no genuine
issue of material fact and the moving party is entitled to
judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In ruling
on a motion for summary judgment, the Court must view the
evidence, and make all reasonable inferences from the evidence,
in the light most favorable to the nonmoving party.  Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  The moving party
bears the initial burden of proving that there is no genuine
issue of material fact in dispute.  Matsushita Elec. Indus. Co.
Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585 n.10 (1986).  Once
the moving party carries this burden, the nonmoving party must
"come forward with 'specific facts showing there is a genuine
issue for trial.'"  Id. at 587 (quoting Fed. R. Civ. P. 56(e)).
The task for the Court is to inquire "whether the evidence
presents a sufficient disagreement to require submission to the
jury or whether it is so one-sided that one party must prevail as
a matter of law."  Liberty Lobby, 477 U.S. at 251-52; Tabas v.
Tabas, 47 F.3d 1280, 1287 (3d Cir. 1995) (en banc).

stipulations of fact.[3]

I.  Factual Background

Cintas Corporation ("Cintas") is the largest employer in the industrial laundry industry in the United States.  Jt. Stipulation of Facts for Parties' Cross-Motions for Summ. J. ("Stip.") ¶ 13.  It employs about 28,000 people at 350 locations in the United States and Canada, and many employees working in Cintas facilities are either female, black, or Hispanic.  Id. ¶¶ 13, 15.  Cintas is philosophically opposed to unions and union organizing.  Id. ¶ 16.[4]

In the fall of 2002, the Union of Needletrades, Industrial & Textile Employees AFL-CIO ("UNITE")[5] "decided to

_____

[3] The parties have stipulated to certain facts, see Jt. Stipulation of Facts for Parties' Cross-Motions for Summ. J. ("Stip.") ¶¶ 1-61; Supplement to Jt. Stipulation ("Stip. Supp.") ¶¶ 65-67, as well as to the authenticity of some documents, see Stip. ¶ 62 (a)-(bb); Stip. Supp. ¶ 68, and the filing of other documents, see Stip. ¶ 63 (cc)-(dd), ¶ 64 (ee).
    We note that plaintiffs object to the introduction of several of UNITE's exhibits, see Letter to the Court, June 14, 2006, but, as evidenced below, plaintiffs are not materially prejudiced by these exhibits, so we shall allow them.

[4] According to the Cintas employee handbook, "Cintas partners work best without outside interferences that disrupt our spirit of teamwork.  Labor unions usually approach relationships with employers with antagonism which often results in a 'we-they' attitude in the work place."  Stip. ¶ 16.  In "The Spirit Is the Difference" -- a Cintas publication explaining its corporate philosophy -- Cintas states that "[w]e simply don't think we can properly manage our business with unions standing between the company and employees."  Id. ¶ 17.

[5] UNITE is a labor union that was formed in 1995 by the merger of two predecessor unions, the International Ladies Garment Workers Union ("ILGWU") and the Amalgamated Clothing & Textile Workers Union ("ACTWU").  Stip. ¶ 9.  In the summer of

launch a campaign concerning Cintas." Id. ¶ 14.  Bruce Raynor,

who has been the President of UNITE since July of 2001,[6] id. ¶

10, described the Cintas campaign in a November 30, 2001 letter

to John Sweeney, the President of the AFL-CIO:

> Our biggest challenge will be launching our
> organizing drive against several laundries
> owned by Cintas, the nation's largest, and
> very anti-union, uniform services company.
> Cintas will prove to be the toughest
> adversary for UNITE for several years, but
> this is a campaign that we must wage due to
> Cintas' 23% market share in the uniform
> services sector.

Id. Ex. A.

The record, which we now canvass, confirms what these

Cintas and UNITE policy statements suggest.  Each party sees its

opponent as the white whale.

A.  Preparing for the Cintas Campaign

The Cintas campaign consisted of a preparation, or

planning, phase and a public phase.  Stip. ¶ 25.  UNITE's

preparation phase took place in the fall and early winter of 2002

through 2003.  Id.  It involved finding out as much as possible

about Cintas and any issues its workers might have, preparing

written materials and organizing strategy, and compiling lists of

---

2004, UNITE merged with the Hotel Employees & Restaurant
Employees Union ("HERE"), to form UNITE HERE.  Id.  For the sake
of simplicity, we shall refer to the entity that is a defendant
in this case as "UNITE."

[6] From 1999 until he became President in 2001, Raynor was
Secretary-Treasurer of UNITE.  Stip. ¶ 10.  Raynor has been
employed by UNITE or its predecessor unions in various capacities
since 1973.  Id.

names and addresses of workers to contact during the public phase.  Id.  From the beginning, "a component of the campaign to organize and unionize Cintas workers" was "finding potential legal claims against Cintas, in part through home visits."  Id. ¶ 21; see also id. Ex. DD Garren Decl. ¶ 2, Dec. 2, 2005.[7]

During the course of its research, UNITE learned that Cintas had paid a ten million dollar settlement in Vaca v. Cintas, BC 250459 (Sup. Ct. Cal. Sept. 4, 2002), an action alleging that UNITE had violated California overtime laws.  Stip. ¶ 18.  UNITE also learned that Cintas had been a defendant in actions alleging unlawful employment discrimination, and was a respondent in OSHA and NLRB proceedings.  Id. ¶ 19.  Moreover, UNITE's research uncovered alleged unfair labor practice charges that unions had filed against Cintas and its subsidiaries from 1998 through 2001.  Id. ¶ 20.

UNITE prepared documents concerning strategy and training for the campaign.[8]  By the fall of 2002, UNITE had

_____

[7] Brent Garren is Senior Associate General Counsel for UNITE.  Stip. Ex. DD Garren Decl. ¶ 1.

[8] Even before the preparation phase, Jennifer Roitman, UNITE's national lead organizer, summarized her understanding of the Cintas campaign in the summer of 2001 in a document entitled "Set-up - August - October."  See UNITE's Mem. of Law in Support of Mot. for Summ. J. ("UNITE's Mem.") 5; see also Stip. Ex. B "Set-up-August-October".  For instance, under the heading "Membership," the "GOAL" in each city was to "ID ex CINTAS workers -- possible plaintiffs, develop contacts with current [C]intas workers, build membership activity and participation to make campaign successful."  Stip. Ex. B at Bates No. 013926.  Under the "Legal" heading, the "GOAL" was "1 legal case (ideally W&H or discrimination) in each city" for which they would "Investigate -- and if we find violations, prepare lawsuits with

4

prepared a "Campaign Plan" that described its "Goal" as a "National Contract covering workers in 6-7 key cities covering 3000 workers." Id. Ex. I; see also Pls.' Mem. of Law in Supp. of Mot. for Summ. J. ("Pls.' Mem.) Ex. 11 Qadeer Dep. 146:8-149:23.[9] The Plan's "Campaign Strategy" included a "Legal" component: "Identify any areas where the company is violating the rights of the workers (FLSA, OSHA, NLRB, EEOC et.) file lawsuits to ensure that the company follows the law." Stip. Ex. I.  In each of the seven metropolitan areas that UNITE targeted, it hired a law firm to assist legal coordinators and provide representation to Cintas employees identified as potential plaintiffs.  UNITE's Mem. Quadeer Decl. ¶ 8.

UNITE also prepared a 132-page "Legal Training Laundry Campaign" document which UNITE attorneys, along with outside counsel, used on September 11 and 12, 2002 to train twelve UNITE members who were the lead organizers and legal coordinators for the regions where UNITE would kick off its campaign.  Id. Ex. L; see also id. Ex. DD Garren Decl. ¶ 4; UNITE's Mem. Qadeer Decl. ¶ 6, Chambers Decl. ¶ 14, May 11, 2006.[10]  According to the "Agenda

---

ex-Cintas workers as plaintiffs -- ready to file on launch day." Id. at Bates No. 013927.

[9] Ahmer Qadeer is UNITE's Deputy Director of the Strategic Affairs Department, and he has held that position or similar ones with the organization since February of 2000.  UNITE's Mem. Qadeer Decl. ¶ 1.  His responsibilities included coordinating aspects of the Cintas campaign, including overseeing all research and campaign activities concerning the company.  Id.

[10] Megan Chambers was the Cintas campaign director for the New York metropolitan area.  UNITE's Mem. Chambers Decl. ¶ 1.

for Legal Training," the two-day training covered such topics as
the Fair Labor Standards Act ("FLSA"), the Family Medical Leave
Act ("FMLA"), various types of discrimination, unfair labor
practices, and workers' compensation.  Stip. Ex. L at Bates No.
055580.[11]  In November of 2002, UNITE conducted another training
session that about sixty field staff attended.  Chambers Decl. ¶
15.  This included a half-day training session on identifying
employee legal violations and the role of legal coordinators.
Id.  A month later, at its Organizing Summit on December 6 and 7,
2002, UNITE used a Power Point presentation that included a slide
stating, "What it will take to beat CINTAS . . . Sustained ground
campaign to win support of workers and develop legal and moral
attack on company."  Stip. Ex. D at Bates No. 026753. [12]

---

[11] The training materials included sample survey questions
regarding discrimination, sexual harassment, and the FLSA, see
Stip. Ex. L at Bates Nos. 055582-055587; discrimination
hypotheticals, id. at Bates Nos. 055588-055591; state
discrimination law summaries, id. at Bates Nos. 055592-055594;
EEOC materials on job discrimination, id. at Bates Nos. 055595-
055605, 055607-055608; a Charge of Discrimination form, id. at
Bates No. 055609; outlines for EEOC, FLSA, and ADA claims, id. at
Bates Nos. 055610-055619; summaries of state wage and hour laws,
id. at Bates Nos. 055621-055622; a comparative chart of federal
discrimination law, id. at Bates No. 055623; FLSA problems to
analyze, id. at Bates Nos. 055624-055625; U.S. Department of
Labor materials on the FLSA, id. at Bates Nos. 055629-055654;
workers' compensation materials, id. at Bates Nos. 055656-055667,
055684-055699; and OSHA regulations and forms, id. at Bates Nos.
055675-055677, 055709-055711.

[12] At an unspecified time, UNITE also developed a Cintas
Shop Towel Survey form and surveys concerning Cintas's alleged
wage and hour violations.  Id. ¶¶ 45-46.

B.  Obtaining Cintas Workers' Contact Information

"In order to contact workers as part of UNITE's organizing campaign," UNITE compiled lists of names and addresses of presumed Cintas workers using a variety of sources, including other workers, telephone and city directories, cross-directories, other public records, Internet databases, raffles, and discarded company lists.  Stip. ¶ 29.  Some organizers also followed workers home to get addresses.  Pls.' Mem. Ex. 16 Scimone Dep. 108:19-109:21, Aug. 23, 2005.[13]  UNITE planned to visit thousands of Cintas employees in their homes.  Stip. ¶ 22.  It deemed such house calls essential because it believed that workers would be reluctant to talk to UNITE representatives at work for fear that Cintas management would retaliate.  Id. ¶ 41.

Most significantly for purposes of this case, UNITE accessed motor vehicle records "to help create lists of names of presumed Cintas workers to contact at home as part of UNITE's Cintas campaign."  Id.  UNITE has used this method -- sometimes referred to as "tagging" -- in organizing campaigns since at least the 1970s.  Id. ¶ 31.  The site coordinators at the various facilities that UNITE was seeking to organize had discretion to use motor vehicle information to build their lists.  Id. ¶ 38. UNITE representatives testified that they were unaware of the union issuing any guidelines, directives, or restrictions regarding when and how organizers could access motor vehicle

_____

[13] Michael Scimone was UNITE's lead organizer in Southeast Pennsylvania, which includes Emmaus.  Pl.'s Mem. 9 n.12.

records. <u>See</u> Pls.' Mem. Ex. 7 Raynor Dep. 53:9-21, Feb. 16, 2005; Ex. 1 Bennett Dep. 140:19-141:5, Jan. 12, 2006; Ex. 12 Chambers Dep. 53:9-21, Sep. 28, 2005; Ex. 14 Gres Dep. 59:21-60:8, July 29, 2005; Ex. 9 Mestrich Dep. 46:6-47:17, Feb. 3, 2005; Ex. 8 DeMay Dep. 55:21-24, 64:10-15, Feb. 8, 2005; Ex. 16 Scimone Dep. 136:10-15.[14]

UNITE used license plate numbers on cars found in Cintas parking lots to access information relating to those license plate numbers contained in state motor vehicle records. Stip. ¶ 30. UNITE organizers would typically watch, or walk or drive through, a Cintas parking lot and either write down or dictate into a tape recorder (to be transcribed later) the license plate numbers, and sometimes the makes and models, of cars parked in the lot, or entering or leaving it. <u>Id.</u> ¶ 33. Ideally, the organizers looked to see if the same license plate showed up at least twice to minimize the risk that the car belonged to a random visitor rather than a Cintas employee. <u>Id.</u> UNITE organizers would use their lists of license plate numbers to access motor vehicle records in one of two ways: through Westlaw -- a computer-assisted research database that has motor vehicle record databases for about thirty states -- or through

---

[14] Ernest Bennett is UNITE's International Vice-President and Director of Organizing. <u>See</u> Pls.' Mem. 8 n.8. Elizabeth Gres was a UNITE Organizing Director in Michigan and became the Director of the Cintas campaign in the fall of 2003. <u>See</u> <u>id.</u> at 8-9 n.9. Keith Mestrich was UNITE's Rule 30(b)(6) witness and, at all relevant times, Director of UNITE's Strategic Affairs Department. <u>See</u> <u>id.</u> at 6 n.5. Peter DeMay is UNITE's Organizing Director for the Chicago and mid-states region. <u>See</u> <u>id.</u>

private investigators or "information brokers."  Id. ¶ 34.

UNITE maintained two Westlaw accounts that allowed access to databases called WestLaw Public Records Pro.  Id. ¶ 35. Jason Coulter, UNITE's Assistant National Organizing Director as of September 1, 2001, see Supp. Stip. Ex. GG, maintained one account, and Peter DeMay, UNITE's Organizing Director for the Chicago and mid-states region, maintained the other.  Stip. ¶ 35. Westlaw account 1003099727, started on September 10, 2002, was originally in the name of Daniel Kotzin, who was a friend of Coulter and not an employee of UNITE.  Id.  Beginning in December of 2002, that account was in the name of "Jason Coulter Consulting - UNITE."  Id.  The other Westlaw account, 1003853823, was in the name of UNITE since its inception on March 27, 2002 and throughout its existence.  Id.

Before an organizer could access the information on Westlaw, a screen would appear that asked the inquiring party to check a box designating which of certain specified "permitted uses" applied that entitled the user to access pursuant to the Drivers' Privacy Protection Act and applicable state laws.  Id. ¶ 36.[15]  Coulter, who gave his password to others and instructed

---

[15] In the databases of UNITE searches that Westlaw produced in response to a subpoena, the permitted use the inquiring party designated is set forth as a number code.  Stip. ¶ 36.  Not all permitted uses were available in all states, but the same number always referred to the same permitted use, regardless of the state:  1 - Use by Gov't Agency; 3 - Skip Tracing/Info Verification; 4 - Court Proceedings; 6 - Insurance Claims Investigation; and 8 - private investigator for DPPA purpose. Id.

them on how to retrieve information using license plates, does not recall telling them which permitted use to select, nor does he recall which he selected.  <u>See</u> Pls.' Mem. Ex. 13 Coulter Dep. 208:5-210:18, Oct. 27, 2005.  Megan Chambers recalls Coulter telling her to select a "legal investigation" option.  <u>See</u> UNITE's Mem. Chambers Decl. ¶ 8.  Peter DeMay randomly selected either "skip tracing" or "litigation or legal research." <u>See</u> Pls.' Mem. Ex. 8 DeMay Dep. 102:19-104:9.  Elizabeth Gres generally selected "skip tracing."  <u>See</u> <u>id.</u> Ex. 14 Gres Dep. 78:4-10.  Michael Scimone did not remember which use he selected. <u>See</u> <u>id.</u> Scimone Dep. 57:6-24.

In Pennsylvania, New York, Michigan and Illinois, UNITE obtained names and addresses through a private investigator named John Rea.  Stip. ¶ 37.  Rea gave license plate numbers to another investigator or "information broker" in the state in question. <u>Id.</u>  They, in turn, either themselves or through yet other intermediaries obtained the information by directly applying to the states' motor vehicle bureaus.  <u>Id.</u>[16]  According to Rea, no one from UNITE ever told him that UNITE needed the license plate information for any particular reason, including in connection with any lawsuit.  Pls.' Mem. Ex. 20 Rea Dep. 20:7-24:6, 35:18-

---

[16] For example, in Pennsylvania, Rea gave the license plate numbers to Infotrack, who forwarded them in turn to American Investigation Resource, who submitted separate "service requests" to Pennsylvania Auto License Brokers, who ultimately got the information from the Pennsylvania Department of Transportation. Stip. ¶ 37.  In New York, Rea dealt with a private investigator named Robert Carroll.  In Michigan, Rea dealt with an investigator named Harold Sneath.  <u>Id.</u>

10

36:14, Feb. 7, 2005.  Two of Rea's UNITE contacts confirm that they did not tell him why they needed the information.  See id. Ex. 8 DeMay Dep. 64:16-65:5; Ex. 12 Chambers Dep. 56:5-25.

UNITE accessed motor vehicle records in connection with its Cintas campaign in Connecticut, New York, Pennsylvania, Ohio, Indiana, Illinois, Michigan, Wisconsin, Nevada, and California (Sacramento).  Stip. ¶ 40.  UNITE did most of the motor vehicle searches during the fall and early winter of 2002 through 2003, and during the preparation period for the public kick-off of UNITE's Cintas campaign, but it also conducted some Cintas-connected motor vehicle searches until the filing of this lawsuit in mid-2004.  Id. ¶ 39.  UNITE representatives "did not maintain any records identifying which employee names and addresses they obtained through motor vehicle searches as opposed to other means."  Pls.' Mem. Ex. 24 Defs.' Supp. Objs. & Resps. to Pls.' First & Second Set of Interr. & Req. for Docs. at 7.

While preparing to conduct home visits of workers at Cintas's Emmaus, Pennsylvania facility, UNITE accessed all of the named plaintiffs' motor vehicle records in late 2003 and early 2004.  Stip. ¶ 8.  Vehicle record abstracts from the Pennsylvania Department of Transportation show that on December 9, 2003 UNITE accessed Russell Christian's records, and on January 23, 2004 it accessed the records of Elizabeth Pichler, Seth Nye, Holly Marston, Kevin Quinn, Jose Sabastro, Russell Daubert, Thomas Riley, and Amy Riley.  See UNITE's Mem. of Law in Opp'n to Pls.' Mot. for Summ. J. ("UNITE's Opp'n"), Kennedy Decl., June 19, 2006,

Ex. B; Pls.' Sur-Reply Ex. 42.[17]  Cintas employed named

plaintiffs Elizabeth Pichler,[18] Seth Nye,[19] Kevin Quinn,[20] Jose L.

Sabastro, Thomas Riley, and Russell Daubert[21] at its Emmaus

facility at times relevant to this case.  Stip. ¶ 1.  Named

-------

[17] Despite UNITE's stipulations that it accessed the named
plaintiffs' motor vehicle records, see Stip. ¶¶ 8, 32, it now
claims in a footnote that the records show it did not access
Thomas Riley's or Amy Riley's information and that their claims
should therefore be dismissed, see UNITE's Opp'n 3 n.1.  At this
very late date, we are not inclined to allow the parties to
renege on their stipulated facts.  Moreover, the record shows
that the Pennsylvania Auto License Brokers, who worked indirectly
on behalf of UNITE, see supra n. 16, did in fact access the
Rileys' motor vehicle record on January 23, 2004.  See Pl.'s Sur-
Reply Ex. 42, Pa. Dept. of Transportation Vehicle Record Abstract
for Thomas & Amy Riley.  In light of defendants' stipulations and
the record evidence, we shall not dismiss the claims of Thomas
Riley and Amy Riley.  It would appear that, for DPPA purposes,
they as married owners of the car constitute a single victim.

[18] Elizabeth Pichler is a non-supervisory Cintas employee.
Stip. ¶ 6.  Unaccountably, in every entry on the docket, Ms.
Pichler's surname is misspelled.  In the accompanying Order, we
at last set the record straight.

[19] In January of 2003, Seth Nye was a management trainee at
Cintas who was promoted to the supervisory position of Service
Manager at the Emmaus facility.  Stip. ¶ 3.  He has the authority
to discipline the employees he supervises.    Id.

[20] Kevin Quinn is a Service Manager and a supervisor.  Stip.
¶ 4.

[21] Jose Sabastro, Thomas Riley, and Russell Daubert are
Service Training coordinators ("STCs").  Stip. ¶ 5.  STCs are
assistants to the Service Managers responsible for training
employees.  Id.  Thomas Riley testified in his deposition that he
was in a supervisory position.  Russell Daubert testified he
also an STC, like Riley.  Id.  Plaintiff Jose Sabastro is also a
salaried STC who assists a Service Manager in the Emmaus facility
in training Cintas drivers.  Id.

plaintiffs Russell Christian,[22] Holly Marston,[23] and Amy Riley[24]
are not Cintas employees and were not Cintas employees at times
relevant to this case.  Id. ¶ 2.  Plaintiffs and Cintas estimate
that UNITE accessed the motor vehicle records of the named
plaintiffs and a plaintiff class consisting of between about
1,758 and 2,005 Cintas employees, or their relatives or friends.
Id. ¶ 32.

        According to Westlaw's records, UNITE conducted about
13,700 motor vehicle searches on Westlaw from August of 2002 to
October 13, 2004.  Stip. Supp. ¶ 65.  Some of these were
duplicate searches of the same license plate number, and some did
not result in the retrieval of any information.  Id.  About 1,576
of UNITE's searches on Westlaw related to Cintas.  Id. ¶ 66.  For
the Cintas-related searches, plaintiffs calculate that 223 had
permitted use indications, and defendants calculate that 148 did.
Id. ¶ 67.[25]

----

        [22] Russell Christian is the live-in boyfriend of a Cintas
employee.  Stip.  ¶ 7.

        [23] Holly Marston is Seth Nye's mother.  Stip. ¶¶ 3, 51.  Her
surname, too, has been misspelled, but no longer.

        [24] Amy Riley is Thomas Riley's wife.  Stip. ¶ 5.

        [25] The parties agree that their varying numbers -- arising
from a dispute over which items should be excluded from the
calculations and possible minor discrepancies in eliminating
duplications -- should not be material to their motions.  Stip. ¶
67 n.1.
        For searches done prior to around May of 2003, West's
designated deposition witness testified that West is unable to
retrieve the permissible use codes associated with those
searches.  See Pls.' Mem. Ex. 21 Appold Dep. 80:8-17, Nov. 3,
2005.

C.  Launching the Cintas Campaign

The public phase started with a kick-off of intense activity on the weekend of January 11, 2003 "when UNITE publicly announced its organizing campaign and began actively organizing." Stip. ¶ 26.  This "blitz" involved, among other things, "house calling," and, after the weekend, leafleting and talking to workers at Cintas facilities.  Id. ¶ 26.  On May 6, 2003, after the public phase was underway, UNITE and the International Brotherhood of Teamsters ("Teamsters") entered into what they called the Cintas Organizing Campaign Cooperation Agreement to "bring their combined resources to bear in a coordinated fashion to win union representation and good collective bargaining agreements for Cintas employees."  Id. ¶ 61, Ex. E.

From January of 2003 through June of 2004, UNITE representatives conducted at least 3,000 home visits to Cintas employees.  Id. ¶ 28.  UNITE or the Teamsters visited the homes of all the named plaintiffs except Seth Nye.  Id. ¶¶ 50-58.[26]

---

[26] Tom Riley's wife, Amy Riley, answered the door to two men who said, "hello, how are you" and identified themselves as being from Cintas.  Stip. ¶¶ 53, 54.  She thought they were Tom's friends from work, so she went to get him down in the basement, where he was working, id.  He went to the door, and she went to the kitchen where she was unable to hear the conversation.  Id. ¶ 54.  Tom Riley asked the two men dressed in black if he could help them, and they explained that they were from UNITE/Teamsters. Id. ¶ 53.  He replied, "There is no need for me to talk with you, there is nothing that you can say to me, and would you please leave."  Id.  They did so.  Id.  Tom Riley came back to his wife and told her never to answer the door to them again.  Id. ¶ 54. She claims that the same two men returned "a week later on a weekday" when she was alone.  Id.

On February 7, 2004 two women, one black and one white, rang Kevin Quinn's doorbell.  Id. ¶ 56.  When he opened the door they

14

The home visits allowed UNITE to talk to workers in a private setting, away from Cintas supervisors.  <u>Id.</u> ¶ 28.  According to Brent Garren, UNITE's Senior Associate General Counsel, UNITE staff members conducted these home visits "to discuss with [Cintas workers] their experiences working at Cintas and their desire for union representation."  <u>Id.</u> Ex. DD Garren Decl. ¶ 5. UNITE representatives testified that before contacting someone they did not know whether that person was aware of any possible legal issues, <u>see</u> Pls.' Mem. Ex. 11 Qadeer Dep. 247:21-249:3; Ex. 12 Chambers Dep. 49:3-8; Ex. 16 Scimone Dep. 114:3-6; Ex. 10 Watson Dep. 32:8-22, nor were they sure that the person was a UNITE employee, <u>see id.</u> Ex. 9 Mestrich Dep. 141:2-12; Ex. 16

---

asked for him by name, and he said, "That's me."  <u>Id.</u>  The women told him that "they were organizing a union campaign against Cintas."  <u>Id.</u>  He told them he was not interested and shut the door.  <u>Id.</u>  The women got in their car and left.  <u>Id.</u>

Jose L. Sabastro was on his porch when two men entered his yard.  <u>Id.</u> ¶ 55.  One man introduced himself and said he was from the Teamsters.  <u>Id.</u>  Sabastro said he was not interested and told them to get off his property, which the two men did.  <u>Id.</u>

Russell Christian said that a man came to the door, identified himself as being from the union and asked if he was Russell Christian.  <u>Id.</u> ¶ 57.  He said, "Yes, I am."  <u>Id.</u>  Asked whether he worked at Cintas, he said, "No," and motioned to Kathleen Kelly saying, "She does."  <u>Id.</u>  Kelly told Christian, "No, I don't want to talk to him.  Shut the door."  <u>Id.</u> Christian did so, and the man left.  <u>Id.</u>

Holly Marston, Seth Nye's mother, answered the door at 1660 Ross Lane on "a cold, cloudy day."  <u>Id.</u> ¶ 51. A short Latino man in a UNITE hat told her that he was "canvassing the area to get support for the union."  <u>Id.</u>  She said, "My son is a management trainee," and the canvasser said, "Oh, he's one of those" and left.  <u>Id.</u>  Both Nye and Marston later received a leaflet from UNITE through the United States mail.  <u>Id.</u> ¶ 52.

Upon answering her doorbell one day, Elizabeth Pichler saw someone from UNITE.  <u>Id.</u> ¶ 58.  She said that she was not interested and shut her door.  <u>Id.</u>

Scimone Dep. 113:8-22.

Field staff used "house call sheets" to record the results of home visits.  Stip. ¶ 22.  During or immediately after house calls, the organizers filled out house call sheets, which had boxes for recording information about (1) the workers' job, shift, ethnicity, and other status; (2) the workers' interest in the union on a numerical scale; and (3) and general comments. Id.  Some of the house call sheets included a notation for "legal follow-up," and some did not.  Id.  The purpose of such sheets was not recording workers' complaints about discrimination, but rather their interest in unionization.  Id. Ex. CC Hodek Second Decl. ¶ 7, Nov. 30, 2005.[27]  UNITE field staff had also developed Law Violation Report Forms, which UNITE used in Michigan when visiting employees in their homes.  Id. ¶ 23.  Moreover, in July of 2003 UNITE developed a form called "Discrimination Inventory: Information to be Gathered in Preparation for Litigation," which asked whether a complaint had been made, the status of the complaint, and whether there was "Potential".  Id. ¶ 24; see also id. Ex. Y Discrimination Inventory form.  UNITE representatives drafted this new form to prepare for and prosecute claims against Cintas.  Stip. Ex. CC, Hodek Second Decl. ¶¶ 1, 5-6; id. Ex. DD Garren Decl. ¶¶ 8-9.

As a result of its home visits, UNITE prepared at least twenty-nine Legal Violations Reports.  Stip. ¶ 27.  Those reports

---

[27] Julie Hodek has been a research analyst with UNITE since June of 2003.  Stip. Ex. CC Hodek Second Decl. ¶ 1.

include people whose names and addresses UNITE got from Westlaw or John Rea, based upon motor vehicle records.  Id. ¶ 27.  UNITE filled out Legal Violation Reports as a result of visiting seven putative class members: Betty Jean Higgs, Ida Mae Ray,[28] Marakisa Henderson, Maria L. Villalta, Maria M. Rubet,[29] Maria Monsod,[30] Mercedes Vega.  Id. ¶ 27.

From 2002 through October 13, 2004, UNITE brought or assisted in bringing against Cintas six federal cases,[31] three state court cases,[32] eighteen charges with the Equal Employment Opportunity Commission ("EEOC"),[33] and four charges with the

---

[28] Ida Mae Ray appears on both the Westlaw Exhibit 8 and Exhibit 9 lists.  Stip. ¶ 27.  Ms. Ray was searched under two separate Westlaw account numbers.  Id.

[29] Maria Rubet appears twice on the Westlaw Exhibit 8 list. Stip. ¶ 27.

[30] Maria Monsod is associated with Edwin Monsod, who appears twice on the Westlaw Exhibit 8 list.  Stip. ¶ 27.

[31] The six federal cases are: Ramirez v. Cintas Corp., No. CV-04-281 (N.D. Cal.) (filed Jan. 20, 2004); Veliz v. Cintas, No. C 03-1180 (SBA) (N.D. Cal.) (filed Mar. 19, 2003); Grindle (Ohio) Plaintiffs; Harris, et al. v. Cintas Corp., No. 04 CV 6040 T(P) (N.D.N.Y.) (filed Jan. 29, 2004); Houston and Cooper v. Cintas Corp., No. C 05-03145 (N.D. Cal.) (filed Aug. 3, 2005); and Holloman v. Cintas Corp., No. A-04-CA-1092 (W.D. Tx.) (filed Dec. 28, 2004).  Stip. ¶ 49.A.1-6.

[32] The three state court cases are: Amaral and Hernandez, et al. v. Cintas Corp. (Sup. Ct. Cal. Alameda Co.) (filed June 23, 2003); Ayon v. Cintas, No. BC310696 (Sup. Ct. Ca. L.A. Co.) (filed Feb. 17, 2004); and a lawsuit by the Connecticut Attorney General to enforce the Clean Water Act.  Stip. ¶ 49.B.1-3.

[33] UNITE assisted eighteen Cintas employees who filed EEOC charges against their employer from July 1, 2002 through October 13, 2004, as well as three employees who filed such charges from December 17, 2004 through July 10, 2005.  Stip. ¶ 49.C.2.

Occupational Safety and Health Administration ("OSHA").[34]   UNITE
also filed unfair labor practice charges with various offices of
the National Labor Relations Board ("NLRB"), some of which were
settled without any admission of liability.   Id. ¶ 42; see also
id. Ex. M UNITE-filed NLRB charges and case correspondence.   It
also assisted two putative Pichler class members in Marin County,
California to file complaints concerning wages, and it wrote a
letter to the County urging enforcement of the wage ordinance.
See UNITE's Mem. Qadeer Decl. Exs. P, Q.

        In addition to the UNITE-assisted EEOC charges that
Cintas employees filed, on November 18, 2003 UNITE and the
International Brotherhood of Teamsters filed a charge with the
U.S. EEOC[35], the Ohio Civil Rights Commission, and the California
Department of Fair Employment and Housing.  The charges alleged
that Cintas discriminated against employees on the basis of race,
color, sex, and national origin, specifying discriminatory acts
at nine Cintas facilities:  Las Vegas, Nevada; San Diego,

---

[34] The OSHA complaints against Cintas concerned its
Rochester, New York facility (filed June 4, 2004); Central Islip,
New York facility (filed May 6, 2004); Bedford Park, Illinois
facility; and Schaumburg, Illinois facility.  Stip. ¶ 49.E.1-4.
    UNITE filed the Central Islip complaint on behalf of Cintas
employee Sergio Mateo.  Id. ¶ 49.E.2.  It also filed a complaint
on Mateo's behalf alleging that Cintas retaliated against him for
requesting health and safety records of employees.  Id. ¶ 44.
The parties' stipulation does not make clear whether these were
two distinct actions.

[35] We note that in a different paragraph the Stipulation
also refers to a November 17, 2003 joint EEOC charge.  The
parties confirmed to Chambers staff that this difference in date
is immaterial because the paragraphs refer to the same joint
charge.

California; Central Islip, New York; Springfield, Missouri; Landover, Maryland; Rochester, New York; Irvington, New Jersey; Westlake, Michigan; San Leandro, California.  Id. ¶ 43.  The charges identified six Cintas employees who alleged that Cintas discriminated against them: Roberto Ramirez and Maria Ubia from Las Vegas, Nevada; Robert Harris from Rochester, New York; Stacey Stern from Chicago, Illinois; Amy Severson from Springfield, Missouri; and Luis Cardoza from San Leandro, California.  Id. The EEOC charge was dismissed on March 8, 2005 because of Ramirez v. Cintas Corp., No. CV-04-281 (N.D. Cal.), a lawsuit based on the same allegations and issues.  Stip. Facts ¶ 49.C.1.

UNITE also sent letters to Cintas employees.  On or about March 19, 2003, it sent a letter to about 1,000 of them. Id. ¶ 47, Ex. R.  UNITE addressed the letter to Cintas drivers and informed them about a national class action lawsuit that it had helped Cintas drivers to file in order to collect unpaid overtime.  Id.  The letter concluded by stating, "For more information about the lawsuit or about how you can become involved in UNITE, contact us . . . ."  Id.  On September 23, 2004, it sent another letter to thousands of current and former Cintas employees.  Id. ¶ 48, Ex. Q.  UNITE and the Teamsters both signed this letter, addressed to "all Current and Former Cintas Drivers," which provided more information about the overtime payment lawsuit, stated there was limited time left to join the lawsuit, and directed those interested in claiming their unpaid overtime wages to fill out an enclosed Consent to Sue form.  Id.

19

Ex. Q.

      D.   Earlier Litigation Concerning the
          Driver's Privacy Protection Act of 1994

      In 2000, plaintiffs in Tarkington v. Hanson and UNITE,
Docket No. 4-00-CV-00525 JMM (E.D. Ark. Aug. 25, 2000), sued
UNITE under the Driver's Privacy Protection Act of 1994 and
Arkansas state law, and filed an amended complaint seeking class
status.  Stip. ¶ 59.  Plaintiffs there alleged that UNITE
obtained motor vehicle license plate numbers from vehicles parked
in the Dillard's Distribution Center in Mabelvale, Arkansas, and
used those licenses plates to wrongfully get people's personal
information -- including names, addresses, and telephone numbers
-- from the state motor vehicle agency, and then solicit people
at their homes.  Id. Ex. AA Tarkington v. UNITE, Am. Class Action
Compl. ¶ 8.

      Brent Garren, UNITE's Senior Associate General Counsel,
in consultation with Dave Prouty, counsel to UNITE's organizing
department, was responsible for directing the course of the
Tarkington litigation.  See Pls.' Mem. Ex. 23 Garren Dep. 42:21-
25, 50:25-51:16, July 28, 2005.  Garren testified in his
deposition that he discussed with Raynor the terms of the
settlement as it was being negotiated.  Id. at 63:24-64:2, 71:6-
13, 84:5-9.[36]

---

[36] When plaintiffs' counsel asked Garren if he had discussed
with Raynor "what the Tarkington lawsuit was about," UNITE's
counsel did not permit Garren to respond, citing grounds of
attorney-client privilege.  See Pls.' Mem. Ex. 3 Garren Dep.

Bruce Raynor executed the two Release and Settlement Agreements concerning Tarkington, Stip. ¶ 60, one between UNITE and the plaintiffs, see id. Ex. O, and the other between UNITE and Dillard's and its counsel, see id. Ex. P.  In the agreement with the plaintiffs, UNITE agreed to permanently expunge from its records all of the plaintiffs' personal information that it "obtained by the actions complained of in the lawsuit," i.e., tagging.  See id. Ex. O at ¶ 3.  UNITE fulfilled this obligation. See Pls.' Mem. Ex. 1 Bennett Dep. 225:7-14, 228:17-229:21; Ex. 23 Garren Dep. 60:9-18.

Jason Coulter, UNITE's Assistant National Organizing Director, testified that he and Ernest Bennett, UNITE's International Vice-President and Director of Organizing, discussed the Dillard's case and "decided to continue to use tags because it was still on occasion a valuable tool for the union to use in organizing workers."  Pls.' Mem. Ex. 13 Coulter Dep. 64:7-18.  According to Bennett, "[t]he context of the discussion was that we needed to be discreet about using the license plate retrieval although we should continue to, but we needed to be discreet because of Dillard's use in a campaign that undermined our effort."  Id. Ex. 1 Bennett Dep. 132:23-133:4.

By "discreet," Bennett meant "let's don't run it high profile and blast it out and be careful using it, because we did not want it to be used as a tactic as Dillard used it in the

---

84:10-15.

organizing campaign." Id. at 133:11-16.  Coulter also told

organizers to exercise discretion.  In light of Tarkington,

during a 2001 non-Cintas campaign in Arkansas, Coulter testified

that he told organizers "to be discreet" because they did not

want the company to find out what they were doing.  Id. Ex. 13,

Coulter Dep. 85:2-8.  While some people at that campaign knew

about the Dillard's campaign, Coulter said they "didn't discuss

the Dillard's case, but we discussed that people needed to be

thoughtful and careful and discreet." Id. at 86:14-16.  They

wanted to avoid having the company learn that they were preparing

an organizing campaign.  Id. at 85:24-86:5.

     E.  This Litigation

Plaintiffs filed this lawsuit on June 28, 2004, and a

few weeks later filed a one-count amended class action complaint

alleging that UNITE, Raynor, and the Teamsters violated the

Driver's Privacy Protection Act of 1994 ("DPPA" or the "Act").

To remedy these alleged violations, plaintiffs each requested

that we award liquidated damages of $2,500, punitive damages,

attorneys' fees, costs, and injunctive relief.  See Am. Compl. at

14.  Defendants moved to dismiss the amended complaint, but we

denied their motion on October 13, 2004.  See Pichler v. UNITE,

339 F. Supp. 2d 665 (E.D. Pa. 2004).

On May 31, 2005, we granted plaintiffs' motion for

class certification with respect to UNITE, denied it with respect

22

to Raynor and the Teamsters, defined a class as against UNITE,[37] and appointed class counsel.  See Pichler v. UNITE, 228 F.R.D. 230, 260-61 (E.D. Pa. 2005).  The class, certified under Fed. R.Civ. P. 23(b)(1)(A), consists of:

> All persons whose personal information from
> motor vehicle records was knowingly obtained,
> used, and/or disclosed, directly or
> indirectly, by UNITE or UNITE HERE between
> July 1, 2002 and October 13, 2004, as part of
> an effort to contact Cintas Corporation
> employees[.]

See Order of Feb. 9, 2006.  On September 23, 2005, we approved a Consent Order between plaintiffs and the Teamsters settling claims between them and dismissing this action as against the Teamsters only.

Following completion of discovery, the parties submitted their cross-motions for summary judgment, as well as their stipulations of fact.  We now address those motions.[38]

III.  Legal Analysis

After setting forth the relevant statutory provisions,

---

[37] We certified a class pursuant to Fed. R. Civ. P. 23(b)(3), see Pichler v. UNITE, 228 F.R.D. 230, 260 (E.D. Pa. 2005), and later, upon agreement of the parties, amended the class definition to extend the class period until October 13, 2004, see Order of Dec. 14, 2005.  The parties then agreed that the class should be certified pursuant to Fed. R. Civ. P. 23(b)(1)(A), rather than Fed. R. Civ. P. 23(b)(3).  Pursuant to their stipulation and Fed. R. Civ. P. 23(c)(1)(C), we re-certified the class under Fed. R. Civ. P. 23(b)(1)(A).  See Order of Feb. 9, 2006.

[38] UNITE revisits the issue of the DPPA's state of mind requirement, a matter upon which we have already ruled.  See Pichler v. UNITE, 228 F.R.D. 230, 241-42 (E.D. Pa. 2005).  We shall therefore not reconsider that issue.

we will consider the motions with respect to UNITE, and then turn to Bruce Raynor.

### A.  The DPPA

Unless one of its exceptions applies, the DPPA forbids state officials from "knowingly disclos[ing] or otherwise mak[ing] available to any person or entity . . . personal information . . . about any individual obtained by the department [of motor vehicles] in connection with a motor vehicle record." 18 U.S.C. § 2721(a)(1) (2006).  It also prohibits others from knowingly "obtain[ing] or disclos[ing] personal information, from a motor vehicle record" for an unlawful purpose and from "mak[ing] false representation[s] to obtain any personal information from an individual's motor vehicle record."  18 U.S.C. § 2722(a), (b).

Section 2724 provides for a civil cause of action:  "A person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court."  18 U.S.C. § 2724(a).

Section 2721 lists fourteen exceptions to the DPPA, two of which are at issue here.  The Act authorizes access:

> For use in connection with any civil,
> criminal, administrative, or arbitral
> proceeding in any Federal, State, or local
> court or agency or before any self-regulatory
> body, including the service of process,
> investigation in anticipation of litigation,

24

and the execution or enforcement of judgments
and orders, or pursuant to an order of a
Federal, State, or local court.

18 U.S.C. § 2721(b)(4) (the "litigation exception").  It also

authorizes access "[f]or use by any government agency, including

any court or law enforcement agency, in carrying out its

functions, or any private person or entity acting on behalf of a

Federal, State, or local agency in carrying out its functions."

18 U.S.C. § 2721(b)(1) (the "acting on behalf of a government

agency exception").

If a defendant is found liable, the court "may" award--

(1) actual damages, but not less than
liquidated damages in the amount of $2,500;

(2) punitive damages upon proof of willful or
reckless disregard of the law;

(3) reasonable attorneys' fees and other
litigation costs reasonably incurred; and

(4) such other preliminary and equitable
relief as the court determines to be
appropriate.

18 U.S.C. § 2724(b).

In our decision on class certification, we held that:

to be eligible to recover under the DPPA, a
plaintiff must prove that (1) the defendant
knowingly obtained, disclosed, or used
personal information from her motor vehicle
records; and (2) the purpose of such
obtaining, disclosure, or use was not
permissible. The plaintiff need not show that
the defendant knew that the obtaining,
disclosure, or use was impermissible.

Pichler v. UNITE, 228 F.R.D. 230, 242 (E.D. Pa. 2005).

B.  <u>UNITE</u>

Before we consider whether the DPPA provides an exception for UNITE's actions, we must address an important issue of statutory construction.  One section in UNITE's brief contends that plaintiffs cannot prove it violated the Act "if at least one of the purposes for which UNITE acquired motor vehicle information was lawful."  UNITE's Mem. 29 C. (format altered).  Plaintiffs dispute such a construction and contend that "liability does not result from the *absence* of any permitted purpose, as Defendants declare, but from the *existence* of 'a purpose not permitted.'"  Pls.' Mem. of Law in Opp'n to Defs.' Mots. for Summ. J. ("Pls.' Opp'n") at 16.

Section 2724 provides that "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, <u>for a purpose not permitted</u> under this chapter shall be liable . . . ."  18 U.S.C.  § 2724(a) (emphasis added).  Thus, one who obtains information is liable each time one gets information "for a purpose not permitted."  Accordingly, if UNITE had three purposes for "obtain[ing], disclos[ing] or us[ing] [plaintiffs'] personal information" and two of those were "permissible uses" but the third was not, UNITE would still be liable for the third purpose.  The Act contains no language that would excuse an impermissible use merely because it was executed in conjunction with a permissible use.[39]

─────────────

[39] We note that this reading is consistent with how at least one Pennsylvania court has interpreted the DPPA.  See <u>Hartman v.</u>

        We now consider the purposes for which UNITE is said to
have obtained plaintiffs' personal information.  As will be seen,
on this record the question of partially permissible uses is not
pertinent because there was no permissible use.

        1.  Organizing Workers

        Plaintiffs contend that UNITE is liable because the
DPPA does not recognize a unionizing campaign as a permissible
use.  UNITE revisits its argument that the DPPA is inapplicable
to union organizing activity because of the NLRB's primary
jurisdiction.  See UNITE's Mem. 44-51.  Having already ruled on
this issue, see Pichler v. UNITE, 339 F. Supp. 2d 665, 668-70
(E.D. Pa. 2004), we shall not reconsider it now.

        The DPPA lists fourteen permissible purposes in Section
2721(b); union organizing is not one of them.  As we have already
held, we will not engraft upon the DPPA a "labor exception" that
would permit unions to acquire and use employees' personal
information, obtained from motor vehicle records, to contact them
during organizing campaigns.  Pichler v. UNITE, 339 F. Supp. 2d
665, 669-70 (E.D. Pa. 2004).  Congress may amend Section 2721(b),
but we cannot.

        The parties have stipulated that UNITE was conducting a
campaign to organize and unionize Cintas workers, and that "to

_____

Dept. of Conservation & Natural Resources, 892 A.2d 897, 904-05
(Pa. Commw. Ct. 2006) (finding that DPPA did not permit
disclosure of personal information where main purpose of using
the information was not permitted, even though there was another
possibly permissible use effected at the same time).

contact workers as part of UNITE's organizing campaign," it
compiled lists of Cintas workers.  See Stip. ¶ 29; see also ¶¶
14, 21.  One method to build these lists was "access[ing]
information contained in state motor vehicle records relating to
those license plate numbers" that were "on cars found in Cintas
parking lots."  Stip. ¶ 30.  "With respect to the Cintas
campaign, UNITE accessed the motor vehicle records of the named
Plaintiffs and a plaintiff class estimated by Plaintiffs and
Cintas to consist of between approximately 1758 and 2005 Cintas
employees, or relatives or friends of Cintas employees."  Id. ¶
32.

        These stipulations leave no doubt that UNITE's tagging
was done to further its organizing campaign.  Because Congress
did not designate union organizing as a permissible use under the
DPPA, we hold that UNITE is liable to plaintiffs under Section
2724(a).

        As noted, without the imagined "labor exception" UNITE
still claims safe harbors in two statutory exceptions.  But as we
now explain, UNITE's activities were not done "in anticipation of
litigation" or "on behalf of a [government] agency" within the
meaning of the DPPA.  We now turn to the parties' arguments
concerning those two exceptions.

### 2.  The Litigation Exception

        According to UNITE, the record establishes that it
acquired and used personal information of the putative Pichler

class members in connection with an investigation in anticipation
of litigation within the meaning of Section 2721(b)(4) of the
DPPA.  See UNITE's Mem. 30-36.  Plaintiffs, in turn, characterize
UNITE's actions as a "mass solicitation of claims in pursuit of
[its] union organizing campaign."  Pls.' Mem. 36.

        For the litigation exception to apply, we have held
that there must be an actual investigation, litigation must
appear likely at the time of the investigation, and the protected
information acquired during the investigation must be of "use" in
the litigation, meaning that there was "a reasonable likelihood
that the decision maker would find the information useful in the
course of the proceeding."  Pichler v. UNITE, 339 F. Supp. 2d
665, 668 (E.D. Pa. 2004).  We understand that "litigation"
"encompass[es] all manner of proceedings identified in §
2721(b)(4), including Board proceedings."  Id.  As we explained,
"[t]his construction ensures that individuals' statutorily
recognized rights to the privacy of their motor vehicle records
are not sacrificed whenever a litigant raises the possibility of
a tenuous connection between the protected information and issues
tangentially related to a conceivable litigation strategy."  Id.

        UNITE asserts that it satisfies our litigation
exception criteria for three reasons.  First, an undisputed
objective and goal of the Cintas campaign was to investigate and
initiate court cases.  Second, litigation appeared likely because
Cintas's workforce was largely minority and female and because
UNITE's pre-campaign investigation revealed prior discrimination

complaints that Cintas employees had filed, namely forty cases
alleging unlawful discrimination, as well as forty-two unfair
labor practice charges against Cintas and its subsidiaries from
1998 through 2001.  See UNITE's Mem. Qadeer Decl. ¶ 4 May 12,
2006.  Third, it was reasonably likely that the EEOC, as well as
state and local agencies, would need to know which employees
suffered discrimination or other labor law violations or knew of
those who had.

      UNITE contends that, given its knowledge of Cintas's
labor law violations, it needed "to contact Cintas employees at
home to investigate whether they were the victims of unlawful
employment discrimination or overtime violations or had evidence
to support those that had already filed such charges."  UNITE's
Mem. 33.  UNITE highlights the Ramirez class action, a Title VII
case alleging race, ethnic, and gender discrimination.  The lead
plaintiff, Robert Ramirez, is a putative class member here, as
are three other Ramirez plaintiffs.  Id., Qadeer Decl. ¶ 16.
UNITE claims that its home visits to all class members who are
women or minorities were part of the investigation it undertook
in anticipation of the Ramirez litigation.

      UNITE also cites to Veliz, the national FLSA overtime
class action for Cintas drivers.  Named plaintiffs Thomas Riley,
Russell Daubert, and Jose Sabastro are or were Cintas drivers who
were eligible to participate in Veliz, and they all received mail
about that litigation.  Daubert received UNITE's September 23,
2004 letter about Veliz, as well as "YES, WE CAN!," a ten-page

"newsletter about uniform justice at Cintas" published by UNITE
and the Teamsters in March of 2004.  UNITE's Mem. Kennedy Decl.,
May 15, 2006, Ex. C  Riley Dep. 12:3-16:1, Dec. 10, 2004;  see
also Stip. Ex. Q "UNIFORM justice!" Sep. 23, 2004; Ex. Z "YES, WE
CAN!" Mar. 2004.  Sabastro also received mail from the union
about Veliz and the "YES, WE CAN!" publication.  UNITE's Mem.
Kennedy Decl. Ex. D Sabastro Dep. 13:5-14:25, 61:3-64:7, Dec. 9,
2004.  Daubert received mail about the lawsuit, but did not read
the documents or know who sent them, nor did he recall receiving
a copy of UNITE's September 23, 2004 letter.  Id. Ex. B Daubert
Dep. 31:6-32:3, Dec. 10, 2004.

        Furthermore, UNITE points out that as a result of home
visits to seven putative class members, UNITE filled out eight
Legal Violation Reports, see Stip. ¶ 27, it identified four
putative class members as victims of discrimination in the
Discrimination Inventory Reports, see Qadeer Decl. ¶ 14, and
sixteen putative class members executed Consents to Sue to enable
them to opt into the Veliz litigation, see id. ¶ 15.  It also
worked with the EEOC in submitting discrimination charges and
investigated allegations of Cintas violations of OSHA and state
environmental regulations.

        Plaintiffs submit that the litigation exception, as we
have explained it, "can only mean a discrete investigation into a
discrete claim or set of claims."  Pls.' Mem. 33.  In other
words, "[f]or ["in anticipation of" of litigation] to have any
meaning, it must mean investigating the merits of an actual

31

potential claim, not merely fishing in the speculative hope that
you will hook something." Pls.' Opp'n 18. As plaintiffs note,
defendants do not allege that they knew whether a person had a
claim, or information relevant to a claim, until they spoke with
that person. Indeed, defendants have stipulated that they were
"<u>finding</u> potential legal claims" throughout the Cintas campaign.
Stip. ¶ 21 (emphasis added). Plaintiffs also take issue with
UNITE's contention that litigation was "likely" because UNITE was
aware of eighty-two legal proceedings against Cintas -- a number
that plaintiffs find unremarkable in a company employing 28,000
workers.

      We agree with plaintiffs that UNITE's activities do not
come within the DPPA's litigation exception. UNITE was "finding"
claims, not investigating them within the meaning of the statute.
Litigation was not "likely" in any realistic way. Indeed, UNITE
accessed the personal information of 1,758 to 2,005 putative
class members, which, as stipulated, resulted in only thirty-one
of those people either becoming involved in litigation against
Cintas or taking steps toward such actions during the class
period. In other words, UNITE had, at best, less than a 1.8%
success rate in "finding" legal claims among the putative class
members.

      UNITE's reading also proves too much. As plaintiffs
point out, at any given time large companies such as DuPont or
Dow Chemical are sure to be involved in multiple legal
proceedings concerning discrimination, wage claims, or pollution.

32

Under UNITE's reading, any union -- or for that matter any law firm -- could research DuPont or Dow Chemical, learn of past litigation and therefore claim that litigation was "likely."  It could then access the personal information of thousands of employees, contact them at their homes, and surely find <u>some</u> legal cases to prosecute.  We do not believe that Congress drafted the DPPA just so we could eviscerate it by importing such claim trolling into its permissible uses.

<u>Wemhoff v. District of Columbia</u>, 887 A.2d 1004, 1006 (D.C. 2005), a case brought under the District of Columbia's Freedom of Information Act, comes to the same conclusion.  There, the District's Department of Motor Vehicles ("DMV") denied a lawyer's request to produce the names and address of motorists who had received traffic violations at a certain intersection, because, <u>inter alia</u>, it claimed the DPPA prevented such disclosures.  <u>Id.</u> at 1006.  The lawyer wanted this information so that he might solicit people to join a class action he had filed concerning the District's enforcement of traffic laws, and he therefore relied on Section 2721(b)(4)'s "in anticipation of litigation" exception.  <u>Id.</u> at 1007, 1010-12.  The court examined our decision here on the motion to dismiss, 339 F. Supp. 2d 665 (E.D. Pa. 2004), and held that "[b]ased on <u>Pichler</u>, and our own reading of § 2721, acquiring personal information from the motor vehicle records for the purpose of finding and soliciting clients for a lawsuit is not a 'permissible use' within the meaning of § 2721(b)."  <u>Id.</u> at 1012.

33

The DPPA thus does not permit one to acquire and use statutorily proscribed personal information to solicit or find claims.  That is all that UNITE's actions amounted to here, and such claim trolling is far short of the concreteness Congress had in mind to remove the DPPA's protection.  UNITE therefore cannot take refuge in the litigation exception.

### 3.    The Acting On Behalf Of A Government Entity Exception

UNITE also argues that it is a private entity that "act[ed] on behalf of a Federal, State, or local agency in carrying out its functions," a permissible use described in Section 2721(b)(1).  UNITE points to its submission of charges of discrimination against Cintas with the federal EEOC, meetings with the EEOC regarding Cintas, information it gave to the EEOC about Cintas, the EEOC's intervention as a plaintiff in Ramirez (based on its determination that the case has national significance), and the UNITE campaign plan's legal component. See UNITE's Mem. 37, Qadeer Decl. ¶ 18, Hodek Decl. ¶¶ 18-23, May 11, 2006; see also Stip. Ex. I Campaign Plan.  UNITE states that it was and is playing the role of a "private attorney general" to eradicate discrimination at Cintas.  See New York Gaslight Club, Inc. v. Carey, 447 U.S. 54, 63 (1980) ("Congress has cast the Title VII plaintiff in the role of 'a private attorney general,' vindicating a policy 'of the highest priority'").  UNITE also filed employment discrimination charges with six states' anti-discrimination agencies.  UNITE's Mem. Qadeer Decl. ¶ 20.

34

As for environmental matters, UNITE brought or assisted in bringing four OSHA complaints, Stip. ¶ 49 E[40]; investigated alleged EPA and OSHA violations at twelve facilities at which putative <u>Pichler</u> class members work, <u>see</u> UNITE's Mem. Frumin Decl. ¶ 4, May 10, 2006, Ex. E; and intervened in a lawsuit by the Connecticut Attorney General against Cintas to enforce the Clean Water Act, Stip. ¶ 49 B.3, a case that resulted in a 2005 settlement with Cintas, UNITE, and Connecticut's Department of Environmental Protection in which three of four UNITE positions were adopted, <u>see</u> UNITE's Mem. Frumin Decl., Ex. N.  UNITE also notes that it assisted a Cintas employee -- one who left Cintas in July of 2002, before the class period here -- to testify at a March 9, 2004 Environmental Protection Agency regulatory hearing addressing proposed shop towel rules, a hearing UNITE had requested.  UNITE's Mem. Frumin Decl. ¶ 3.

As plaintiffs note, UNITE does not connect any of its NLRB complaints to license plate searches.  It does not cite any information obtained from home visits to putative class members with information it may have provided to any agency.  Indeed, it is unclear which, if any, putative class members were involved

---

[40] UNITE also claims it assisted employees in filing OSHA complaints at thirty-one Cintas locations.  <u>See</u> UNITE's Mem. 20. For this proposition, it cites to paragraph four and Exhibit E of the Declaration of Eric Frumin, UNITE's Director of Occupational Health and Safety.  UNITE's Mem. Frumin Decl. ¶¶ 1, 4, Ex. E. Frumin declares that he "investigated allegations of EPA violation at Cintas facilities" and provides a log listing thirty-two such facilities.  <u>Id.</u> at ¶¶ 1, 4.  He does not state that he assisted Cintas employees in filing thirty-one OSHA complaints, so we shall not credit this allegation.

with the legal proceedings UNITE identifies.  The record simply does not support an inference that UNITE's tagging activities were undertaken on behalf of a government agency.  Its self-appointment as agency champion therefore fails.

            C.  Bruce Raynor

        The amended complaint charges Raynor with the same alleged violation of the DPPA as UNITE, "knowingly obtaining, disclosing and/or using Plaintiffs' . . . personal information from motor vehicle records without Plaintiffs' . . . consent, for purposes not permitted by the DPPA."  See Am. Compl. ¶ 65.  It also alleges that he "caused UNITE and others . . . to engage in, as well as personally directed, authorized or otherwise supervised, the unlawful conduct alleged."  Id. ¶ 19.  Moreover, it claims that Raynor "agreed and conspired" with UNITE to commit acts in violation of the DPPA.  Id. ¶ 66.  Since we denied plaintiffs' motion for class certification as against Raynor, each of the plaintiffs must show that he committed the alleged acts as against him or her.

        Raynor contends that the record offers no support for the allegations against him.  As evidenced from the specific facts brought to our attention, Raynor is correct, and he is therefore entitled to summary judgment.  Indeed, plaintiffs seem implicitly to acknowledge this because they now argue that Raynor's liability rests on his turning a "blind eye" to the tagging.  They request that, to the extent that Raynor argues

this "theory" is different from the amended complaint's allegations, we consider the pleadings amended to conform to the evidence, pursuant to Fed. R. Civ. P. 15(b). Even if we did, plaintiffs' new theory remains unhelpful on this record.

Plaintiffs cite to Raynor's awareness that UNITE had used tagging in the 1970s, <u>see</u> Pls.' Mem. Ex. 7 Raynor Dep. 18:4-22:11, his knowledge of the DPPA from the <u>Tarkington</u> case, and his awareness that organizers had discretion to tag and his failure to direct them to stop, <u>see</u> <u>id.</u> at 31:3-32:23. Based on these facts, they contend that "Raynor's participation and *cooperation* consisted of deliberately turning a blind eye to a practice he knew about and which he knew to be of at best questionable legality under the DPPA." Pls.' Mem. 43.

Plaintiffs now rely on Pennsylvania's participation theory of tort liability:

> The general, if not universal, rule is that an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor; but that an officer of a corporation who takes no part in the commission of the tort committed by the corporation is not personally liable to third persons for such a tort, nor for the acts of other agents, officers or employees of the corporation in committing it, unless he specifically directed the particular act to be done or participated, or cooperated therein.

<u>Mill Run Associates v. Locke Property Co., Inc.</u>, 282 F. Supp. 2d 278, 287-88 (E.D. Pa. 2003) (quoting <u>Wicks v. Milzoco Builders, Inc.</u>, 470 A.2d 86, 90 (1983)).

Plaintiffs fail to point to anything in the record

showing that Raynor "specifically directed . . . or participated, or cooperated" in tagging.  Plaintiffs have provided no evidence to rebut Raynor's testimony that, as President, he has not discussed tagging with anyone and has been "uninvolved in what methods were or were not used to obtain information about where workers live."  Raynor Mot., Rochman Decl., May 12, 2006, Ex. C Raynor Dep. 63:14-17, see also id. at 92:21-93:16.

The other cases upon which plaintiffs rely do not support the proposition that corporate officers are liable for their nonfeasance under this theory.  Indeed, the Pennsylvania Supreme Court has made clear that liability under the participation theory "attaches only where the corporate officer is an actor who participates in the wrongful acts . . . [and] corporate officers may be held liable for misfeasance . . . . [but] may not be held liable for mere nonfeasance." Wicks v. Milzoco Builders, Inc., 470 A.2d 86, 90 (Pa. 1983).

Even if Raynor was aware of UNITE's tagging in the 1970s and knew about the DPPA and UNITE's tagging at the time of the Tarkington litigation, any failure to stop the tagging of the named plaintiffs' vehicles would amount to nonfeasance, not misfeasance.  Thus, he cannot be liable under plaintiffs' newfound theory.

IV.  Federal Rule of Civil Procedure 54(b)

Under Federal Rule of Civil Procedure 54(b), "when multiple parties are involved, the court may direct the entry of

38

a final judgment as to one or more but fewer than all of the . .
. parties only upon an express determination that there is no
just reason for delay and upon an express direction for the entry
of judgment."  We find that there is "no just reason" to delay
entry of judgment in favor of the named plaintiffs and against
UNITE but not Raynor.[41]  Indeed, there is every reason for
appellate clarity on the important issues at stake in this test
litigation.  Although we take comfort in the Eleventh Circuit's
acceptance of our reading of the DPPA, Kehoe v. Fidelity Federal
Bank & Trust, 421 F.3d 1209, 1213 n.3, 1215, n.5 (11th Cir.

---

[41] We note UNITE's argument that our acceptance of
plaintiffs' understanding of the DPPA's litigation exception
would render the named plaintiffs inadequate class
representatives and require us to revisit our certification
decision.  UNITE contends that because it accessed the named
plaintiffs' personal information after litigation was underway --
namely Ramirez and Veliz -- there "is a factual difference that
creates a legally significant distinction between them and most
of the absent class members."  UNITE's Opp'n 30.  UNITE contends
that plaintiffs' focus on "a discreet investigation into a
discreet claim" reading of the permissible uses makes is
necessary to examine what litigation was in play when UNITE
acquired each plaintiff's personal information.
    Since the facts upon which UNITE bases its argument were
available at the time of class certification, UNITE should have
raised this argument then.  Regardless, as plaintiffs point out,
UNITE has never argued that it had a different purpose when
accessing the named plaintiffs' personal information, or that it
treated the named plaintiffs differently than any other people
whose information they accessed.  As with all the presumed Cintas
employees UNITE contacted, it did not know whether the named
plaintiffs had information about any legal claims until speaking
with them.  Finally, "even relatively pronounced factual
differences will generally not preclude a finding of typicality
where there is a strong similarity of legal theories."  Pichler
v. UNITE, 228 F.R.D. 230, 250 (E.D. Pa. 2005) (quoting Baby Neal
v. Casey, 43 F.3d 48, 58 (3d Cir. 1994)).  Accordingly, we shall
not reconsider our class certification decision.

2005), these are questions of first impression in our Circuit[42] that should be resolved before we turn to the cumbersome and costly machinery of class-wide relief.

Pursuant to Rule 54(b), we shall enter judgment in the amount of $2,500 for each of the named plaintiffs and against UNITE only. We will defer our decisions on all other remedial issues, including those UNITE raises now,[43] as well as the matter

---

[42] At issue in Kehoe is the permissible use described in § 2721(b)(12): "For bulk distribution for surveys, marketing or solicitations if the State has obtained the express consent of the person to whom such personal information pertains." 18 U.S.C. § 2721. We note that, when recently denying the petition for writ of certiorari in Kehoe, see Fidelity Federal Bank & Trust v. Kehoe, 126 S.Ct. 1612 (2006), Justice Scalia wrote a concurrence, in which Justice Alito joined. Justice Scalia noted that the case presented an important, and as yet unanswered, legal question: "whether petitioner can be held liable under the Act if it did not know that the State had failed to comply with the Act's 'express consent' requirement." Id.

Justice Scalia's concern does not touch upon our case because the knowing nature of UNITE's acts is established. Indeed, if there were ever any doubt on this subject, UNITE's participation in Tarkington and its resolution removes it. See supra at 20-22. Moreover, UNITE invokes different permissible uses to justify its actions -- the "acting on behalf of" and "litigation" exception, see 18 U.S.C. § 2721(b)(1), (4) -- which contain no requirement that any entity obtain a person's "express consent" to access his or her personal information.

[43] UNITE presses several arguments regarding remedial issues. First, it contends that we have discretion to limit class damages to an amount below $2,500 and that we should do so in this case. See UNITE's Mem. 51-55. Second, UNITE argues that the class action must be dismissed because Fifth Amendment Due Process is violated when statutory liquidated damages recoveries are inflated by incorporation into a class action. See id. at 56. Finally, it insists that the Norris-LaGuardia Act, 29 U.S.C. § 104, deprives us of the jurisdiction to award the injunctive relief that plaintiffs seek. See id. at 56-58.

We are also mindful of the relief problem associated with the reality that many class members -- said to be in excess of 600, UNITE's Mem. Qadeer Decl. ¶ 13 -- not only had their motor vehicle information accessed, but also had UNITE home visits as a

of class-wide claims procedures, until our Court of Appeals has addressed all matters concerning liability.

IV.  Conclusion

          For the reasons discussed herein, we find that UNITE violated the DPPA.  We shall therefore grant plaintiffs' motion for summary judgment as against UNITE and enter judgment in the amount of $2,500 for each named plaintiff.[44]  We also find that Bruce Raynor is entitled to judgment in his favor, as we are granting his motion.


                    BY THE COURT:


                    /s/ Stewart Dalzell, J.

---

"use" of that information.  Whether such class members suffered one or two statutory violations is an issue we leave for another day after final appellate action.

          [44] Although the named plaintiffs are entitled to their costs and reasonable attorneys' fees, it may be difficult to parse counsel's services only for the named plaintiffs as opposed to the lawyers' services for the class.  Plaintiffs' counsel shall advise us of their views on this parsing question when they file their bill of costs.  We of course would prefer that counsel for plaintiffs and UNITE could come to an agreement about the timing of costs and fee submissions.