IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ELIZABETH PICHLER, et al.       :       CIVIL ACTION
                                :
          v.                    :
                                :
UNITE (UNION OF NEEDLETRADES,   :
INDUSTRIAL & TEXTILE EMPLOYEES  :
AFL-CIO), et al.                :       NO. 04-2841

MEMORANDUM

Dalzell, J.                                August 11, 2009

          Defendant UNITE has moved for summary judgment on the

issues of punitive damages and multiple statutory damages under

the Driver's Privacy Protection Act ("DPPA" or "the Act"), 18

U.S.C. §§ 2721-2725, as well as for reconsideration of our June

5, 2009 Order.  The class plaintiffs state that they do not seek

multiple statutory damages, and we shall grant UNITE's motion for

summary judgment on that issue.  We now resolve the remaining two

motions.


## I.   Factual Background

          We have previously published comprehensive recitations

of the facts related to this case, see, e.g., Pichler v. UNITE,

446 F. Supp. 2d 353, 354-365 (E.D. Pa. 2006), and will only

summarize that history here as needed.  We granted summary

judgment on the question of liability under the DPPA.  Id. at

373.  Our Court of Appeals last year affirmed our determination

of liability and remanded the case specifically to consider whether summary judgment was warranted on the question of punitive damages.  <u>Pichler v. UNITE</u>, 542 F.3d 380, 387, 396-97 (3d Cir. 2008).

UNITE violated the DPPA by "tagging" Cintas employees and their friends and family.  "Tagging" is a union organizing tactic that involves finding out one's license plate number and then running that number through a state driver's license and registration database to learn the owner's address.  Union organizers then approach those who live at the address to find out if they wish to be involved in organizing their workplace. "Tagging" permits the union to quickly determine the addresses of most of the employees without tipping the employer off to the union's activities.

The class plaintiffs complain that UNITE tagged them, and those similarly situated, during the run-up to the union's Cintas organizing campaign and shortly thereafter.  Joint Stip. ¶¶ 38-41.  Between 2002 and until this lawsuit was filed in mid-2004, UNITE members would tag the cars parked at Cintas's facilities.  <u>Id.</u> ¶ 39.  Some of the people whose license plates UNITE tagged filed suit complaining that their federally protected privacy had been violated.

In 2000, before the Cintas campaign began, employees of Dillard's and the department store itself chain sued UNITE during the preparation of an organizing campaign in Arkansas for violating the DPPA and Arkansas state law.  Id. ¶ 59.  UNITE President Bruce Raynor ultimately executed settlement agreements on behalf of UNITE with both the Tarkington plaintiffs and Dillard's.  Id. ¶ 60, Ex. O, P. These agreements resolved all of the claims the Tarkington plaintiffs brought against UNITE without any admission of liability from UNITE, and obliged UNITE to expunge any information it acquired through its tagging efforts related to the Dillard's campaign.  Id.  UNITE complied with the terms of the settlement agreements.  See Pls.' Mem. Ex. 1 [Bennett Dep.] at 225:7-14, 228:17-229:21; Ex. 23 [Garren Dep.] 60:9-18.

Jennifer Jason testified that during the 2001 Brylane campaign in Indiana, Jason Coulter, UNITE's Assistant National Organizing Director, and other UNITE members told her that because of the Tarkington lawsuit UNITE "could no longer run license plates."  Id. Ex. 31 [Jason Dep.] at 50:4-15.  But then because of the slow pace of UNITE's efforts, Coulter got "special dispensation" to tag the cars in Brylane's parking lots.  Id. at 83:18.

Jason testified that Coulter had her and several other UNITE members rotate through the local libraries, access the state Web site, and conduct the address retrievals using the username and password of an insurance company that Coulter had set up in Wisconsin.  Id. at 85:12-86:19.  Jason stated that UNITE undertook these efforts because "it was explained to me that UNITE didn't have a legal reason for running license plates."  Id. at 90:4-6.  Jason stated that she "knew we were doing things that were, if not completely illegal, that if it ever came out to a worker, it would seem completely suspicious and shady.  And I knew that we needed to be discreet."  Id. at 80:16-21.

Coulter testified that he and Ernest Bennett, UNITE's International Vice-President and Director of Organizing, discussed Tarkington and "decided to continue to use tags because it was still on occasion a valuable tool for the union to use in organizing workers."  Pls.' Mem. Ex. 13 [Coulter Dep.] 64:7-18.  According to Bennett, "[t]he context of the discussion was that we needed to be discreet about using the license plate retrieval although we should continue to, but we needed to be discreet because of Dillard's use in a campaign that undermined our effort."  Bennett Dep. at 132:23-133:4.

4

By "discreet," Bennett meant "let's don't run it high profile and blast it out and be careful using it, because we did not want it to be used as a tactic as Dillard used it in the organizing campaign." Id. at 133:11-16. Coulter also told organizers to exercise discretion.  In light of Tarkington, during the Brylane campaign, Coulter testified that he told organizers "to be discreet" because they did not want the company to find out what they were doing.  Id. Ex. 13, Coulter Dep. 85:2-8.  While some people at that campaign knew about the Dillard's campaign, Coulter said they "didn't discuss the Dillard's case, but we discussed that people needed to be thoughtful and careful and discreet." Id. at 86:14-16.  They wanted to avoid having the company learn that they were preparing an organizing campaign.  Id. at 85:24-86:5.

During the run-up to the Cintas campaign, Coulter opened a Westlaw account under the name Coulter Consulting to use for address retrievals.  Coulter Dep. at 185:4.  Coulter paid for these Westlaw charges with his credit card, and was reimbursed by Bennett with a personal check for over $8,000.  Bennett Dep. at 262:9-265:7; Pls.' Mem. Ex. 32.  Before the public announcement of the Cintas campaign, UNITE destroyed anything "used during the prep of the campaign."  Jason Dep. at 128:10-11.  Jason testified

5

that UNITE did so because (presciently, as it turned out) "we
understood that Cintas was a very litigious company.  And that we
expected them to file lawsuits against us."  Id. at 127:1-3.

## II.  Analysis[1]

_____

[1]Summary judgment is appropriate if there is no genuine
issue of material fact and the moving party is entitled to
judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In ruling
on a motion for summary judgment, the Court must view the
evidence, and make all reasonable inferences from the evidence,
in the light most favorable to the nonmoving party.  Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Whenever a
factual issue arises which cannot be resolved without a
credibility determination, at this stage the Court must credit
the non-moving party's evidence over that presented by the moving
party.  Id. at 255.
     The moving party bears the initial burden of proving that
there is no genuine issue of material fact in dispute.
Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S.
574, 585 n.10 (1986). Once the moving party carries this burden,
the nonmoving party must "come forward with 'specific facts
showing there is a genuine issue for trial.'"  Id. at 587
(quoting Fed. R. Civ. P. 56(e)).  The non-moving party must
present something more than mere allegations, general denials,
vague statements, or suspicions.  Trap Rock Indus., Inc. v. Local
825, 982 F.2d 884, 890 (3d Cir. 1992); Fireman's Ins. Co. of
Newark v. DuFresne, 676 F.2d 965, 969 (3d Cir.1982).  It is not
enough to discredit the moving party's evidence, the non-moving
party is required to "present affirmative evidence in order to
defeat a properly supported motion for summary judgment." Liberty
Lobby, 477 U.S. at 257 (emphasis in original).  A proper motion
for summary judgment will not be defeated by merely colorable or
insignificantly probative evidence. See id. at 249-50.  Also, if
the non-moving party has the burden of proof at trial, then that
party must establish the existence of each element on which it
bears the burden.  Celotex Corp. v. Catrett, 477 U.S. 317, 323
(1986).

UNITE argues that it is entitled to summary judgment because State Farm v. Campbell, 538 U.S. 408 (2003), prevents the class plaintiffs from recovering punitive damages in this case. UNITE also argues that it cannot, as a matter of law, be liable for punitive damages because it maintained throughout this litigation that its compilation and use of driver's license information fell under a DPPA exception, and therefore it cannot have acted in willful or reckless disregard of the law.  We consider each of these arguments before turning to UNITE's motion for reconsideration of our June 5, 2009 Order.

**A.    State Farm v. Campbell**

UNITE contends that the Supreme Court in Campbell created a multi-factor test for assessing whether punitive damages are appropriate, and that applying that test here results in no possibility of punitive damages.

In Campbell, the plaintiffs won an insurance bad faith claim that resulted in compensatory damages of $1 million and punitive damages of $145 million.  The Supreme Court found that based on its analysis in BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996), the punitive damages award was excessive.

But Campbell is inapposite here.  That case involved

7

review of a punitive damages award to determine whether it was excessive because "[t]he Due Process Clause...prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." Campbell, 538 U.S. at 416.  But Campbell and Gore only apply after a jury has awarded punitive damages.  These two cases create protections as to the amount of a punitive damages award, but not against the imposition of such an award.[2]  If the law permits a punitive damages recovery, and a genuine question of material fact exists as to the culpability of a defendant's conduct, then nothing in either Campbell or Gore permits a court to take the issue of punitive damages from a jury's hands.

The law provides for summary judgment, among other procedural devices, to protect a defendant from a jury considering the question of punitive damages when it should not. So we turn to the question of whether a reasonable jury could

---

[2]To be sure, Campbell does limit the type of evidence about punitive damages that may be presented at trial, and what a jury may rely on in determining punitive damages, e.g., "[a] jury must be instructed...that it may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred," or "[a] defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages." Campbell, 538 U.S. at 422.  As the parties have not briefed whether Campbell obliges us to exclude certain of class plaintiffs' evidence for punitive damages, we do not address that question here.

find that UNITE acted in such a manner as to warrant imposing punitive damages under the DPPA.

### B.  <u>Willful or Reckless Disregard of the Law</u>

The DPPA states that the court may impose "punitive damages upon proof of willful or reckless disregard of the law." 18 U.S.C. § 2724(b)(2).  Our Court of Appeals opined that it could not "conceive of what willful or reckless disregard for the DPPA could be other than where a party appreciated it was engaging in wrongful conduct under the DPPA."  <u>Pichler v. UNITE</u>, 542 F.3d at 397 (internal quotations omitted).

In other civil contexts, the Supreme Court has equated "willfulness" with "reckless disregard".  <u>Safeco Ins. Co. v. Burr</u>, 551 U.S. 47, 57 (2007) ("where willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well"); <u>Kolstad v. American Dental Ass'n</u>, 527 U.S. 526, 550 (1999).  Whatever the distinctions may be between willfulness and recklessness, at the very least the former encompasses the latter, and, therefore, the plaintiffs here would be entitled to a jury trial on punitive damages only if they could show that UNITE acted in reckless disregard of the law.  <u>See Safeco Ins.</u>

9

Co., 551 at 57.

Kolstad is instructive on this point.  Kolstad considered the question of what showing a plaintiff had to make in order to recover punitive damages in an employment discrimination lawsuit.  The statute in question provided for recovery of punitive damages if the employer acts with "malice or with reckless indifference to the [plaintiff's] federally protected rights."  527 U.S. at 535 (quoting 42 U.S.C. § 1981 a(b)(1)).  Specifically, this "'reckless indifference' pertain[s] to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination."  Id.  A plaintiff can recover punitive damages if she can show that her employer "discriminate[d] in the face of a perceived risk that its actions will violate federal law."  Id. at 536.

It seems to us that Kolstad's teaching applies as much to the DPPA as it does to employment discrimination.  A plaintiff may not recover punitive damages simply by showing that the defendant violated the Act.  Instead, the plaintiff must show that when the defendant violated the DPPA it knew or should have known that it was violating the Act.

The class plaintiffs present three sets of evidence to

10

establish that UNITE knew or should have known it was violating the DPPA.  First, they display the settlement in the <u>Tarkington</u> case, which they contend should have put UNITE on notice that tagging violated the DPPA.  Second, the plaintiffs point to UNITE's concealment of its information gathering activities prior to the announcement of the Cintas campaign, and argue that this secretive approach is evidence of UNITE's consciousness of guilt. Third, they contend that UNITE continued its tagging activities even after this lawsuit was filed.

However compelling plaintiffs' evidence may be, it suffers from a fatal flaw: it presupposes that one could have known that union organizers' tagging was illegal under the DPPA before our August 30, 2006 ruling on liability.  Whether the DPPA prohibited such tagging was, to say the least, an unsettled question when UNITE allegedly violated that statute, and this creates insuperable legal and factual barriers to the class plaintiffs' recovery of punitive damages from UNITE.

### 1.   UNITE's Actions Cannot Have Been in Reckless Disregard of Law that Did Not Exist

From the beginning of this case, UNITE has maintained that tagging was either covered by one of the DPPA's exceptions, or that a union organizing exception ought to be engrafted onto

the statute to make it consistent with federal labor law.  Before
we determined that this was not so, and before our Court of
Appeals affirmed our ruling, and before the Supreme Court denied
review,[3] the possibility remained very real that tagging was, as
a matter of law, permitted under the DPPA.[4]  UNITE could not have
acted in reckless disregard of the law until a court definitively
ruled on what that law was.  Before that time, UNITE could not
have known -- much less should have known -- that the DPPA made
union organizers' tagging illegal.

Returning to <u>Kolstad</u> and its progeny, employment
discrimination plaintiffs <u>can</u> supply evidence of an employer's
concealment of violations of federal laws to establish reckless
indifference to federally protected rights.  <u>Kolstad</u>, 527 U.S. at
551 (Stevens, J., concurring in part, dissenting in part) ("There
are other means of proving that an employer willfully violated
the law.  An employer, may, for example...conceal evidence
regarding its 'true' selection procedures because it knows they
violate federal law.").  But a plaintiff provides this evidence
ultimately to show that the employer "knew the law but at the

---

[3] <u>UNITE v. Pichler</u>, 129 S.Ct. 1662 (2009).

[4]Indeed, in four pages of vigorous dissent, Judge Sloviter
would have held precisely that.  <u>See</u> <u>Pichler</u>, 542 F.3d at 400-03.

12

same time attempted to evade it." Benjamin v. United Merchs. and Mfrs., 873 F.2d 41, 45 (2d Cir. 1989).

This is exactly where the analogy between this case and employment discrimination jurisprudence breaks down. All employers understand that federal law forbids discrimination based on certain protected categories. An enormous edifice of caselaw spells this out, and in excruciating detail. Thus, an employer's attempts to conceal a supervisor's invidious discrimination constitutes an attempt to avoid liability with full cognizance that the supervisor's actions violated settled law.

Before our August 30, 2006 ruling, UNITE could not have been on notice that its organizers' tagging violated the DPPA. Any assertion that the DPPA unequivocally made tagging illegal before our ruling on liability is fanciful. The liability issues in this case were -- every one of them -- all questions of first impression. We specifically certified our judgment under Fed. R. Civ. P. 54(b) for appellate review precisely because "this class action presents novel questions in need of appellate clarity before we begin the costly, complex and cumbersome process of class-wide relief." Pichler v. UNITE, 457 F. Supp. 2d at 526 n.1. Indeed, the opening words of Judge Chagares's opinion for

13

the Court of Appeals were, "This case presents several issues of
first impression in this court of appeals." Pichler v. UNITE,
542 F.3d at 383.

Before our August 30, 2006 decision[5], one could
reasonably believe that the DPPA permitted UNITE's tagging
activities. This is evidenced by the fact that an appellate
judge with thirty years' distinguished experience disagreed with
our holding and would have held that the DPPA's litigation
exception covered UNITE's activities. Pichler, 542 F.3d at 401-
02 (Sloviter, J., dissenting).[6] It is also evidenced by the
Eleventh Circuit's holding in Thomas v. George, Hartz, Lundeen,
Fulmer, Johnstone, King, & Stevens, P.A., 525 F.3d 1107 (11th
Cir. 2008), that claims trolling, of the kind we faulted UNITE

---

[5]To be sure, the Eleventh Circuit a year earlier found our
earlier canvass of the DPPA "well-reasoned and persuasive," Kehoe
v. Fidelity Fed. Bank & Trust, 421 F.3d 1209, 1213 n.3 (11th Cir.
2005), but Kehoe only dealt with our reading of actual versus
liquidated damages under the DPPA as part of our analysis of
class certification issues. See Pichler v. UNITE, 228 F.R.D. 230
(E.D. Pa. 2005).

[6]It is also worth noting that when Justices Scalia and Alito
concurred in the denial of the certiorari petition in Kehoe, see
Fidelity Fed. Bank & Trust v. Kehoe, 547 U.S. 1051 (2006), they
were at pains to stress that the "enormous potential liability,
which turns on a question of federal statutory interpretation, is
a strong factor in deciding whether to grant certiorari," but
that on the then-not-fully-developed record, granting the writ
"would be premature now." Id.

for, <u>was</u> permitted under the DPPA.[7]  No evidence exists before August 30, 2006 that could show that UNITE was or should have been on notice that union organizers' tagging was illegal, and therefore that UNITE knew or should have known it was violating the DPPA.

To permit a jury to consider the question of punitive damages would allow a jury to find UNITE acted with reckless disregard of the law before UNITE could have been on notice that

---

[7]In <u>Thomas</u>, defendant law firm acquired 284,000 driving records from the state Department of Motor Vehicles, and used the addresses to send out 1,000 letters to specific car owners in an attempt to acquire evidence of a custom and practice of deceptive acts that would later be used to bring claims under Florida consumer protection laws.  <u>Id.</u> at 1109, 1115.  The district court granted summary judgment, and the Eleventh Circuit affirmed, because the defendant's activity fell under the litigation exception.  <u>Id.</u> at 1115.

When considering whether UNITE's activities fit under the litigation exception, we held that

UNITE was "finding" claims, not investigating them within the meaning of the statute. Litigation was not "likely" in any realistic way. Indeed, UNITE accessed the personal information of 1,758 to 2,005 putative class members, which, as stipulated, resulted in only thirty-one of those people either becoming involved in litigation against Cintas or taking steps toward such actions during the class period. In other words, UNITE had, at best, less than a 1.8% success rate in "finding" legal claims among the putative class members.

<u>Pichler</u>, 446 F. Supp. 2d at 369.

15

its activities were illegal.[8]  Such a result would defy common

sense.  It would also deter defendants wishing to test and

clarify the law through litigation from making that legitimate

choice for fear that their actions would open them up to punitive

damages if they lost a test case under a new or unconstrued

statute.

     As a matter of law, UNITE cannot have acted with

reckless disregard of the law.

### 2.    Plaintiffs Cannot Establish UNITE Acted in Reckless Disregard of Law that Did Not Exist

     The unsettled state of the law also creates insuperable

factual problems for the class plaintiffs.  They must present

evidence that establishes that UNITE knew or should have known

that union organizers' tagging violated the DPPA.  But none of

their evidence can do this.

     At worst, evidence regarding the Tarkington case

establishes that UNITE knew the DPPA existed.  UNITE admitted no

---

[8]As we have previously held, and as our Court of Appeals has affirmed, liability under the DPPA requires only that the defendant knowingly acquired the driver's license information. Pichler, 542 F.3d at 397.  Our determination here thus does not affect UNITE's liability under the Act since UNITE could (and did) violate the DPPA before our August 30, 2006 ruling because it did not need to know that it was violating the DPPA.

liability in the settlement agreement.  Parties often settle this
way.  To infer from such a settlement that a party knew that it
had in fact violated federal law would deter defendants from
settling because regardless of the terms of the settlement, the
mere fact of settlement could be used against them to infer the
requisite scienter for punitive damages in a later proceeding.
Such deterrence would constitute an unwelcome result and one
contrary to the law's traditional embrace of settlements.

        UNITE's concealment of its activities cannot establish
that UNITE knew or should have known that tagging was illegal
under the DPPA.  Such evidence merely shows that, at worst, UNITE
was aware that it <u>might</u> be sued for its activities in preparation
for the Cintas campaign, including the union's conducting address
retrievals based on license plate numbers.  But the awareness of
litigation <u>risk</u> is not the same as awareness that one's actions
are likely illegal.  One cannot be on notice that one's actions
are illegal and act in reckless disregard of a statute that
courts had never construed on a reasonably debatable point.
Here, tagging by union organizers was not held unequivocally
illegal under the DPPA until -- at the very earliest -- our
August 30, 2006 ruling, and therefore UNITE could not have been
on notice that tagging by its organizers was illegal until that

17

date.

Class plaintiffs' evidence that UNITE continued tagging
after the plaintiffs filed the current lawsuit also does not
suffice to establish that UNITE knew or should have known it was
violating the DPPA.  If UNITE continued tagging after our August
30, 2006 decision, then a jury could find UNITE acted with
reckless disregard of the law.  A jury certainly could do so
after the Court of Appeals's 2008 affirmance.  But the evidence
plaintiffs proffer merely consists of print-outs of license-plate
searches conducted on Westlaw that only run into 2005.  Moreover,
nothing connects these searches to <u>this</u> litigation other than the
fact that UNITE conducted them.  Without more evidence to link
these searches to tagging and the current litigation, it is at
best speculative to infer from these searches that UNITE violated
the DPPA and <u>knew</u> <u>it</u> <u>was</u> <u>likely</u> <u>breaking</u> <u>the</u> <u>law</u>.

Thus, the evidence class plaintiffs provide here would
not allow a reasonable jury to find that UNITE knew or should
have known the DPPA prohibited tagging by union organizers.

### C.   <u>UNITE's Motion for Reconsideration</u>

UNITE has also moved for reconsideration of our June 5,
2009 Order, specifically our determination that a jury does not

need to determine whether to impose statutory damages on UNITE because we have granted summary judgment on the question of liability.  UNITE argues that despite our grant of summary judgment on the issue of liability -- now affirmed -- a jury could nevertheless opt to award no damages and, therefore, UNITE is entitled to a jury trial on the imposition of liquidated damages under the DPPA.

We will grant a motion for reconsideration only if "the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court [rendered its decision]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice."  Max's Seafood Café v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999).

UNITE seeks reconsideration under (3) of Max's Seafood. UNITE contends that there is a right to a jury trial under the Seventh Amendment on the issue of compensatory damages under the DPPA.  UNITE points to our Court of Appeals's decision that punitive damages under the DPPA require a jury determination, Pichler, 542 F.3d at 389, and argues that this holding implies -- since that Court did not explicitly say so -- that imposition of compensatory damages should also require a jury verdict.  UNITE

19

then points to the DPPA's language and argues that it makes the
imposition of any damages award discretionary because the statute
states that the "court may award" a variety of damages. 18 U.S.C.
§ 2724 (emphasis added).  On this basis, UNITE contends that it
is entitled to have a jury decide whether the statutory
liquidated damages award should be imposed at all.

Our Court of Appeals held that a DPPA claim "[l]ike §
1983...sounds in tort," and that since the issue of punitive
damages was left to juries at the time the Seventh Amendment was
adopted, there is a jury trial right on that issue.  Pichler, 542
F.3d at 388-89.  The same could be true for compensatory damages
under the DPPA because the amount of damages for a claim in a
court of law (as opposed to equity or admiralty) is traditionally
left to the jury.  See City of Monterey v. Delmonte Dunes at
Monterey, Ltd., 526 U.S. 687, 710 (1999) (holding that § 1983
action sounds in tort, it affords monetary relief and therefore
legal relief, and entitles one to a jury trial under the Seventh
Amendment); Feltner v. Columbia Pictures Television, Inc., 523
U.S. 340, 553 (1998) (holding that monetary relief is legal,
legal relief usually entitles one to a jury trial, and "[t]he
right to a jury trial includes the right to have a jury determine
the amount of statutory damages") (emphasis in original).

But we do not need to determine now whether UNITE has a right to a jury trial on the issue of compensatory damages under the DPPA.  Neither the Seventh Amendment[9] nor the DPPA requires that a jury decide whether to impose liquidated damages after a court has granted summary judgment on the issue of liability. Plaintiffs present no evidence of actual damages and we have held, and the Court of Appeals affirmed, that plaintiffs are each entitled to $2,500 in statutory liquidated damages.

UNITE contends that the imposition of _any_ damages must be discretionary because the statute uses the word _may_.  The DPPA states that "the court _may_ award...actual damages, but not less than liquidated damages in the amount of $2,500."  18 U.S.C. § 2724 (emphasis added).  To be sure, the use of the word _may_ implies discretion in imposing damages, but _may_ can be used synonymously with _shall_ or _must_ if such a reading best effectuates the intent of Congress.  _Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co._, 529 U.S. 193, 198 (2000)("the mere use of 'may' is not necessarily conclusive of congressional intent to provide for a permissive or discretionary authority"); _United_

---

[9]The grant of summary judgment does not deprive a party of its right to a jury trial under the Seventh Amendment.  _Fid. & Deposit Co. of Maryland v. United States_, 187 U.S. 315, 319-21 (1902).

States v. Rodgers, 461 U.S. 677, 706 (1983) ("The word 'may,'
when used in a statute, usually implies some degree of
discretion. This common-sense principle of statutory construction
is by no means invariable, however, and can be defeated by
indications of legislative intent to the contrary or by obvious
inferences from the structure and purpose of the
statute.")(internal citations omitted).  If we read may in the
statute to make all four possible remedies discretionary, then it
would be possible for a plaintiff to establish liability and yet
not recover any damages.  But we do not think that Congress
intended any such result in the DPPA.

Comparing the original bill with the enacted statute
shows that Congress did not intend to be permissive here.  The
language of the compensatory damages provision in the original
bill only applied to non-willful violators and provided that
"[a]ny person or other entity (other than a State or agency
thereof) that violates this chapter shall be subject to a civil
penalty in an amount not to exceed $5,000." H.R. 3365, 103d
Cong. (Oct. 26, 1993).  Although the original "shall" was turned
into a "may" in the final statute, the number of available
remedies was also increased and the description of the penalty
changed.  If the change from "shall" to "may" had been the only

22

alteration in the statute, it could have suggested that Congress opted for a permissive penalty provision scheme. See Muscogee (Creek) Nation v. Hodel, 851 F.2d 1439, 1444 (D.C. Cir. 1988), cert. denied, 488 U.S. 1010 (1989) ("Where the words of a later statute differ from those of a previous one on the same or related subject, the Congress must have intended them to have a different meaning."). But the alterations in other parts of the statute complicate matters.  Congress opted to reduce the compensatory damages penalty, increase the number of available remedies against civil defendants, and change "civil penalty" to "liquidated damages."  Each of these changes suggests that Congress wanted to make the provisions of the DPPA stronger, not more elastic or permissive.

The use of the term "liquidated damages" is particularly telling.  Liquidated damages are damages that the parties to a contract agree on in order to obviate the need to calculate damages in the case of a breach.  Restatement (First) of Contracts § 339 ("a breach is uncertain and difficult of estimation in money, experience has shown that the estimate of a court or jury is no more likely to be exact compensation than is the advance estimate of the parties themselves."); see also Pierce Assoc., Inc. v. Nemours Foundation, 865 F.2d 530, 546 (3d

Cir. 1988) ("damages are recoverable under a valid liquidated damages provision even though no actual damages are proven as a consequence of that breach"); Commonwealth, Dep't of Transp. v. Mitchell, 535 A.2d 581, 587 n.2 (Pa. 1987) ("Once it has been determined that liquidated damages are recoverable under the contract, evidence of actual damage ... is inadmissible."). In a contract action, the existence of a liquidated damages provision renders a jury determination of damages unnecessary. See Restatement (First) of Contracts § 339 ("the enforcement of such agreements saves the time of courts, juries, parties, and witnesses and reduces the expense of litigation").

In other statutory actions, liquidated damages are often predicated on some other factual showing, and therefore a jury determination of the predicate fact may be necessary before liquidated damages can be granted. See, e.g., Potence v. Hazelton Area School Dist., 357 F.3d 366, 372 (3d Cir. 2004) (ADEA's "liquidated damages" provision, which automatically doubles back-pay awards, only applies when a jury finds a willful violation of the ADEA). But under the DPPA, there is no need for any such predicate showing. In fact, after the plaintiff establishes the defendant has violated the statute, the plaintiff need not provide any evidence of actual injury. Pichler, 542

24

F.3d at 398.

      We assume that Congress knows what terms mean, especially terms of art like <u>liquidated</u> <u>damages</u>. <u>See</u> <u>id</u>. (citing <u>Pichler v. UNITE</u>, 228 F.R.D. at 244 ("Congress's decision to use the technical term 'liquidated damages' in the DPPA suggests that it intended to incorporate the locution's well-understood meaning. In other words, the reference to 'liquidated damages' implies that a DPPA plaintiff should receive damages on the same terms as a plaintiff who proves breach of a contract with a reasonable liquidated damages provision.")).  Here, the most natural reading of the statute is that Congress inserted "liquidated damages" into the statute's first penalty provision in order to render that particular phrase mandatory, while maintaining the permissiveness of the other three penalty provisions.  Our Court of Appeals held that the statutory damages provisions of the DPPA "enables the court to award actual damages, however high they might be....[but then] limits that authority on the low end of the scale, creating a damage award floor.  While the court may award actual damages, it may not grant an award 'less than liquidated damages in the amount of

$2,500.'" Id. at 398 (quoting 18 U.S.C. § 2724(b)(1)).[10]  We take this to mean that the lowest possible award for a violation of the DPPA is $2,500, not zero as UNITE would have us hold.

Our reading of the statute also comports with Congress's overall purpose for the statute, and avoids odd results.  The DPPA was enacted to prohibit "knowingly obtaining or using personal information, derived from a motor vehicle record, for any impermissible purpose."  H.R. 3365, 103d Cong. (Oct. 26, 1993).  Congress's stated intent was to protect driver's license information from disclosure for an unenumerated purpose.  Without a mandatory damages provision, that protection could be rendered meaningless because a jury could negate damages.  Of course, UNITE's contention would also effectively read Rule 56 out of liquidated damages statutes, a consequence no court has, to our knowledge, endorsed.

We will therefore deny UNITE's motion for reconsideration.

BY THE COURT:

 __\s\Stewart Dalzell

---

[10]This was also the precise holding in Kehoe, supra.