IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ELIZABETH PICHLER, et al.          :     CIVIL ACTION
                                   :
          v.                       :
                                   :
UNITE (UNION OF NEEDLETRADES,      :
INDUSTRIAL & TEXTILE EMPLOYEES     :
AFL-CIO)                           :     NO. 04-2841

MEMORANDUM

Dalzell, J.                              February 22, 2011

          This Memorandum will consider the resolution of this

class action that has reposed on this Court's docket since June

28, 2004.  As it risks understatement to mention that the

background of this case has been extensively rehearsed[1], we will

only briefly describe it here in order to put into relief class

counsel's motion for approval of the settlement and for an award

of attorneys' fees and expenses.

          This action alleged UNITE's violation of the privacy of

---

[1] Pichler v. UNITE, 339 F.Supp.2d 665 (E.D. Pa. 2004)
(holding the action not a labor dispute exempt from the DPPA)
("Pichler I"); 228 F.R.D. 230 (E.D. Pa. 2005) (certifying class
action against UNITE) ("Pichler II"); 446 F.Supp.2d 353 (E.D. Pa.
2006) (granting summary judgment as to liability against UNITE
only and entering judgment of $2,500 per violation of certain
named plaintiffs) ("Pichler III"); 457 F.Supp.2d 524 (E.D. Pa.
2006) (amended final judgment) ("Pichler IV"); 238 F.R.D. 405
(E.D. Pa. 2006) (unsealing much of the record) ("Pichler V"); and
646 F.Supp.2d 759 (E.D. Pa. 2009) (denying punitive damages,
entering $2,500 judgment for nine remaining named plaintiffs, and
enjoining UNITE from using their motor vehicle information)
("Pichler VI").

public motor vehicle records of various employees of Cintas

Corporation in the Allentown, Pennsylvania area. The named

plaintiffs and then-putative class representatives claimed that

UNITE and the International Brotherhood of Teamsters ("IBT")

violated the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C.

§ 2721, et seq., when UNITE[2] organizers obtained the plaintiffs'

names and addresses from official motor vehicle records as part

of UNITE's nationwide campaign to unionize Cintas.

After extensive discovery and motion practice, we

certified a class which, pursuant to the settlement, both sides

now agree numbers as many as 1,209 members. After disposing of

the liability issues involving the class representatives, we

entered judgment in most of their favor for $2,500 each and

resolved other related issues as to them only. See Pichler III

and IV.

Both sides cross-appealed to the Court of Appeals,

which ultimately affirmed our imposition of liability and entry

---

[2] UNITE is an acronym for the Union of Needletrades,
Industrial & Textile Employees AFL-CIO. After this action was
filed, UNITE joined with another union to form UNITE HERE. The
settling party is actually "UNITE HERE" as successor to defendant
"UNITE", but for ease of reference and consistency we will
throughout this Memorandum refer to the defendant and settling
party as "UNITE".

of separate awards to two class representatives and the dismissal of two others.  <u>Pichler v. UNITE</u>, 542 F.3d 380 (3d Cir. 2008). The Court of Appeals vacated and remanded for further proceedings our refusal to award punitive damages or grant multiple awards of liquidated damages.  Notably, the Court of Appeals did not address questions relating to classwide relief.

The United States Supreme Court denied UNITE's petition for a writ of <u>certiorari</u> on March 23, 2009, <u>UNITE v. Pichler</u>, 129 S.Ct. 1662 (2009).  On remand after the Supreme Court's denial of review, UNITE moved for summary judgment on the punitive damages issue, which the class opposed.  In <u>Pichler VI</u> we granted UNITE's motion and denied the class the right to seek punitive damages. Whereupon, we entered judgment on August 12, 2009 for the remaining class representatives in the amount of $2,500 each and enjoined UNITE from using their motor vehicle information.[3]

After it became apparent from the plaintiffs' submissions that they disagreed over many issues regarding class-wide relief and other class-related matters, with their agreement we referred the matter to the Hon. Jacob P. Hart for mediation.

---

[3] By this time plaintiffs had settled and dismissed their claims against the IBT and Bruce Raynor.  Thus, UNITE remained the only defendant in the class action.

After protracted mediation that included three sessions before

Judge Hart, the parties finally agreed to a Settlement Agreement

that we preliminarily approved in our Order of October 15, 2010.

Notices were mailed first class to the 1,209 members that the

parties agreed were potential members of the class entitled to

submit proofs of claim.  We convened a final fairness hearing on

February 18, 2011.

The Settlement Agreement

        After almost a year of negotiations under the patient

and creative supervision of Judge Hart[4], the parties on September

30, 2010 at last executed the Settlement Agreement.  Briefly

summarized, the Settlement Agreement adopted this Court's

December 14, 2005 class definition in Pichler II which included:

> All persons whose personal
> information from motor vehicle
> records was knowingly obtained,
> used and/or disclosed, directly or
> indirectly, by UNITE or UNITE HERE
> between July 1, 2002 and October
> 13, 2004 to attempt to contact
> Cintas Corporation employees.

Sett. Agr. at ¶ 2.5.  The Agreement also obliged UNITE to deposit

$4,022,500 into an escrow account to pay claimants and to fund

---

        [4] Indeed, counsel for both sides agreed at the fairness
hearing that Judge Hart's efforts were "invaluable and
essential."

the $1 million in attorneys' fees and costs to be paid to class counsel if we approved that sum.

As noted, the Settlement Agreement identified 1,209 potential class members with known addresses.  It also provided that each eligible class member should receive the statutorily liquidated damages of $2,500 to which we found such class members should be entitled, rather than actual damages (a statutorily significant distinction, <u>see</u> 18 U.S.C. § 2724(b)(1)).  To the extent that fewer than 1,209 potential claim members become eligible claimants, any balance remaining in the escrow account would be returned to UNITE.

On October 15, 2010, we entered an Order granting preliminary approval of the settlement.  This Order gave objectors until January 4, 2011 to file any objections to the Settlement Agreement, and set the fairness hearing that we in fact convened (as ordered) on February 18, 2011.  The Order also imposed a deadline of April 8, 2011 for potential class members to send in completed Claim Forms in order to determine whether they were indeed eligible to receive the $2,500.

As of the hearing, no one had objected to any term of the Settlement Agreement or to the agreed-upon award of attorneys' fees and costs.

<u>Fairness Analysis</u>

Since 1975 the leading case in this Circuit for determining the fairness, reasonableness and adequacy of class action settlements is <u>Girsh v. Jepson</u>, 521 F.2d 153 (3d Cir. 1975). <u>Girsh</u> identified, <u>id.</u> at 157, nine factors that courts should consider in determining whether to approve class action settlements.[5] To be sure, our Court of Appeals has recently noted that the nine <u>Girsh</u> factors are not necessarily exclusive factors that courts should consider, <u>see</u> <u>In re Insurance Brokerage Antitrust Litig.</u>, 579 F.3d 241, 259 n.17 (3d Cir. 2009) (citation omitted). But, as will shortly become clear, the fairness, reasonableness and adequacy of this settlement is so plain that we need not consider any factors beyond those <u>Girsh</u> identified.

---

[5] The nine <u>Girsh</u> factors are: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

A.   <u>Complexity, Expense and Duration of the Litigation</u>

This first <u>Girsh</u> factor need not detain us in view of the pendency since June of 2004 of this hotly-contested action.

In the recitation of the pertinent history, we listed in note 1 the six reported decisions we have made, as well as the Court of Appeals's exhaustive canvass of the many issues -- almost all of first impression -- that it canvassed after we entered judgment as to the named plaintiffs only.  Indeed, it is fair to say that every issue of any moment that we faced in this litigation was of first impression.  The DPPA landscape was so barren of landmarks that when a Court of Appeals first navigated the terrain it looked to our decision in <u>Pichler II</u> for assistance.  <u>Kehoe v. Fidelity Federal Bank & Trust</u>, 421 F.3d 1209, 1213 n.3 (11th Cir. 2005) (holding, with respect to the reasoning in <u>Pichler II</u> that considered several novel issues, "we find its analysis of the issue before us well-reasoned and persuasive").

UNITE is unquestionably correct when it notes in its memorandum that "[h]ad a settlement agreement not been reached, the Court and the parties would have had to resolve the same issues addressed by the Settlement Agreement -- determining how an individual demonstrates membership in the Class and hence

entitlement to an award of liquidated damages, whether Class

Members may recover multiple damages, and the form of any final

judgment." Mem. at 8. And the history of this litigation

demonstrates beyond peradventure that UNITE is also correct that

any final disposition we made "would not necessarily have ended

the litigation", _id.,_ and that one or both sides "would likely

have appealed the final judgment to the Third Circuit." _Id._ In

short, absent a settlement, this almost seven year saga would age

to become a latter-day _Jarndyce and Jarndyce_.

     The first _Girsh_ factor weighs heavily in favor of

approval of this settlement.

     B.   The Reaction of the Class

     Unlike other settlements where Courts necessarily must,

at least in part, rely on publication notice, here the parties

agreed on the identity of each and every potential class member.

Thus, it was possible to send to 1,209 people a first-class

mailing of the Notice at their last known addresses. As of the

January 4, 2011 deadline, not one potential class member

objected. By the time of the hearing, that number remained at

zero.[6]

---

     [6] To be sure, class counsel reported at the hearing that
some mailings have been reported as undeliverable, but this only

The second <u>Girsh</u> factor strongly favors approving the settlement.

C.   The Stage of the
     <u>Proceedings and Quantum of Discovery</u>

This third <u>Girsh</u> factor is, as our Court of Appeals later noted, designed "to ensure that a proposed settlement is the product of informed negotiations . . . ." <u>In re Prudential Ins. Co. of Am. Sales Practices Litig.</u>, 148 F.3d 283, 319 (3d Cir. 1998).  Again, UNITE understates the reality when it observes that it "is difficult to conceive of a matter in which the parties are more informed about the underlying facts and law."  Mem. at 9.  There were, for example, depositions of forty individuals as well as review of thousands of pages of documents.  As UNITE adds, "[t]he litigation of this matter, both in this Court and the Third Circuit, has, in large part, established the law in this jurisdiction regarding DPPA liability."  <u>Id.</u>; <u>see Pichler v. UNITE</u>, 542 F.3d at 383 (3d Cir. 2008) ("This case presents several issues of first impression in this court of appeals regarding application of the Driver's Privacy Protection Act of 1994.").  As noted above, the Eleventh Circuit in <u>Kehoe</u>,

---

constitutes mundane evidence (if any more were needed) that we will never live in a perfect world.

_supra_, also found our reasoning "persuasive".  Not-at-all-parenthetically, <u>Kehoe</u> reversed a district court decision to the contrary of <u>Pichler II</u>.

Under these circumstances, there is no doubt that the parties are intimately familiar with the facts and law at issue.  It is also, as UNITE points out, "beyond dispute that the Settlement resulted from arms-length negotiations between Class Counsel and UNITE's counsel."  Mem. at 10.  By the time the parties proffered the settlement to us, this matter had reposed on our docket for over six years.  The remaining issues -- and they were many and, as noted, worthy of <u>Bleak House</u>[7] -- still had to be decided.  After three protracted settlement conferences under the supervision of Judge Hart -- himself a demonstrated master of mediation -- the matter at last was resolved.

This third <u>Girsh</u> factor unquestionably supports the

---

[7] For example, assume class representatives Thomas and Amy Riley, who are married registered co-owners of a car, received two visits from a UNITE organizer made possible by finding the Rileys' car registration in the Pennsylvania Department of Motor Vehicles.  Do Thomas and Amy <u>each</u> get $2,500?  Should they get $2,500 for <u>each</u> visit by the organizer because each visit constitutes a different "use" under 18 U.S.C. § 2724(a)?  It would take little time for the fertile imaginations of lawyers to multiply this exemplar into dozens of occasions for pettifogging that would justly place this case beside <u>Jarndyce and Jarndyce</u> "which was squeezed dry years upon years ago."  Charles Dickens, <u>Bleak House</u> 7 (Norton Critical Ed. 1977).

approval of this settlement.

D.   Litigation Risks and Maintaining the Class Action

Although the Settlement Agreement provides for the payment of the full $2,500 per eligible class member -- one hundred percent of the liquidated damages we held were applicable -- and although the Court of Appeals affirmed our decision as to the named plaintiffs, the question as to liability of the class action was, as UNITE notes, dependent on the viability of our decision in Pichler VI granting summary judgment to UNITE on the putative damages question.  Indeed, from the beginning of this case, our holding that only statutory damages of $2,500 were available was the linchpin of our holding on class action certification.  See Pichler II at n.48.  While we harbor little doubt on our decision regarding putative damages, our Court of Appeals could well have taken another view, which alone could have been fatal to the maintenance of this litigation as a class action.

It is therefore clear that class members would be unlikely to benefit from further litigation, and indeed the handsome result obtained in the Settlement Agreement would be put at risk had the litigation continued.  The fourth, fifth and sixth Girsh factors together tip in favor of approval.

11

E.  Ability of the Defendant
    to Withstand a Greater Judgment

As noted in our description of the Settlement

Agreement, UNITE is paying each class member the full amount we

awarded to the named plaintiffs.  And against the contingencies

of further litigation and the risks entailed with it, UNITE has

in fact paid the full amount at issue into escrow.

This seventh factor is therefore of no moment to our

Girsh calculus.

F.  Range of Reasonableness

These Girsh factors (eight and nine), too, are readily

disposed of.  Under the proposed Settlement Agreement, each

eligible class member will receive one hundred percent of what we

awarded to the named plaintiffs.  This result alone puts this

case in stark contrast to every other class action over which we

have presided, where claimants typically received only a small

percentage of their possible recovery if the matter had proceeded

to judgment.  And it bears repeating that class members' one

hundred percent recovery is not subject to reduction for counsel

fees, which UNITE will pay separately.

Since UNITE has already deposited the funds into the

escrow account, each of the 1,209 individuals on the list of

potential class members will, if eligible, promptly receive the
$2,500 payment to which we held they are entitled. Such an
outcome defines reasonableness.

Taken together, there is no doubt under <u>Girsh</u> that the
settlement is fair, reasonable and adequate. We will therefore
approve it.

Attorneys' Fees and Expenses

Class counsel's motion for an award of attorneys' fees
and costs in the exact amount of one million dollars need not
long detain us.

It is important to note here that class counsel was
originally retained by Cintas Corporation, a national employer
with over $3.5 billion in sales in fiscal year 2010. Cintas is
publicly-traded on NASDAQ. As of the close of trading on
February 17, 2011, Cintas had a market capitalization of
$4,260,227,460 (145,301,073 outstanding common shares at a
closing price of $29.32).

Cintas describes itself in its Report on SEC Form 10-K
(the "10-K") as the employer (as of May 31, 2010) of
"approximately 30,000 employees of which approximately 225 were
represented by labor unions". 10-K at 4. Thus, on the face of

its 10-K, in one short sentence Cintas describes itself as being essentially union-free.  See also note 8, below.  Its market capitalization and number of employees also make clear that it is a major business enterprise.

Class counsel advises in its motion for the award of fees and expenses that through December 31, 2010 it "has charged Cintas a total of $1,442,449.82 in fees and $127,227.78 in out-of-pocket disbursements."  Mem. of Law in Supp. of Pls.' Mot. for Award of Atty. Fees for Pls.' Class's Counsel ("Atty. Fee Mem.") at 7.  After the writeoff of $10,846.22, Cintas was billed $1,548,826.30.  Class counsel represents that "Cintas has paid nearly all of this amount" id., and has done so on a monthly basis throughout the course of this litigation.

Thus, we are here in the unusual position of having a lodestar that has no hypothetical aspect to it.  Cintas, a highly-sophisticated purchaser of legal services, has regularly paid for these services and the incurring of these expenses for over six and a half years.  The award class counsel seeks here is only 64.6% of this real-world lodestar amount.  Measured against an outcome where eligible class members receive one hundred percent of what we held they were entitled, this discount of the lodestar is generous and the sum to be paid is (relatively)

modest.

And measured against a litigation where each side
regarded its opponent as the White Whale,[8] there is no need to
belabor the usual analysis undertaken under the fee-shifting
authority of <u>Hensley v. Eckerhart</u>, 461 U.S. 424 (1982) or its
progeny in this Circuit.  In the class action context, we are
mindful of the need to look at the lodestar as our Court of
Appeals instructed in, <u>e.g.</u>, <u>In Re Prudential</u>, 148 F.3d at 336-
40.

It is important to stress that, unlike cases such as <u>In
re Rite Aid Sec. Litig.</u>, 396 F.3d 294 (3d Cir. 2005), this is not

_____

[8] As to the parties' regard for each other as Ahab and the
White Whale, a flavor of this perception may be found in Cintas's
description of itself on page 6 of its 10-K:

> Cintas continues to be the target of a corporate
> unionization campaign by several unions.  These unions
> are attempting to pressure Cintas into surrendering our
> employees' rights to a government-supervised election
> by unilaterally accepting union representation.  We
> continue to vigorously oppose this campaign and defend
> our employees' rights to a government-supervised
> election.

But it bears stress that in contrast to the epic antagonism of
the parties, class counsel and UNITE's counsel throughout this
litigation have conducted themselves with high standards of
professionalism.  To be sure, every inch of ground was hard-
fought, but we salute class counsel and UNITE's for the exemplary
level of their advocacy.

15

a common fund case.  As canvassed at length, the class recovery

will in no way be diminished by class counsel's receipt of

attorneys' fees and expenses.  Thus, it is a matter of

indifference to any class member what UNITE has agreed to pay

class counsel.

But since the lodestar here is uniquely "hard" because

a sophisticated third party has in fact paid it over more than

six years, and because the sought fee and expense constitute less

than two-thirds of the lodestar, there can be no question as to

its reasonableness.  We will therefore approve the agreed-upon

one million dollar payment to class counsel.


BY THE COURT:


\_\_\s\Stewart Dalzell